# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

PRINCE WILLIAM SCHOOL BOARD V. STUART AND PALMER.

JANUARY 15th, 1885.

1. LEGISLATION—*Constitution—Bequests for public uses.*—Before 1790 S. J. bequeathed £600 to the vestry of D. parish, in P. W. county, to be put out on real security, and the interest applied to educate poor children of that county. By an act of the Legislature, in 1790, the powers and duties of the vestry were conferred on the overseers of the poor of said county, and they lent the amount of said bequest, then £885, to C. B., and secured same on land in F. county. By an act of the Legislature, in 1819, the powers and duties of said overseers were transferred to the school commissioners of said county, who received the annual interest on said loan until 1860. C. B. died in that year, and his heirs conveyed the land to W. and J. G., subject to said lien. The latter sold the land, in 1863, to S. and P., and an act was passed by the Legislature, at Richmond, on 29th September, 1863 (see Acts 1863–'64, page 42, entitled "an act for the relief of W. E. and J. B. Gaskins"), authorizing them to pay into the literary fund the amount of said lien, and, upon the receipt thereof by the Second Auditor, the Attorney-General was authorized to release said land from said lien. Accordingly the amount was paid in Confederate currency, and on 10th October, 1863, the deed of release was executed. The land was then conveyed to S. and P. By an act of the Legislature, in 1872, the county school board of P. W. county became the successors of the overseers of the poor of said county, and in 1881 brought their bill in chance y, in the circuit court of F county, to declare the said act of 29th of September, 1863, unconstitutional, and the payment to the Auditor void, and to annul the deed of release of 10th October, 1863, and to subject the land to the lien created by the deed of 20th November, 1790. The defendants demurred and answered. On hearing the circuit court decreed in accordance with the prayer of the bill. On appeal here—

HELD (by a majority of the court, LEWIS, P., and HINTON, J., dissenting):

1. The act of the Legislature passed 29th September, 1863, is constitutional and valid.

2. Funds dedicated to public uses are entirely within the scope of the legislative powers of the General Assembly, and acts of legislation changing the custody of such funds, and directing payment thereof to the new custodian, and the execution of a release to the debtor are valid, and binding on all affected thereby.

3. Such acts come within the scope of the act of the restored government passed 28th February, 1866, validating "certain acts, contracts, and proceedings during the late war."

4. The case of the *Bank of Old Dominion* v. *McVeigh*, 20 Gratt. 457, reviewed and distinguished from the case at bar.

Appeal from decree of circuit court of Fauquier county, rendered 28th December, 1881, in the chancery cause of the county school board of Prince William county, plaintiff, against William A. Stuart, George W. Palmer, William E. Gaskins, and others, defendants.

The object of this suit, which is sequel to the case of *Stuart and Palmer* v. *Thornton and als.*, 75 Va. 215, was to declare unconstitutional the act of the legislature passed 29th September, 1863, at Richmond (see Acts 1863–'64, page 42, entitled "an act for the relief of William E. Gaskins and James H. Gaskins"), and to declare void the payment made to the Second Auditor of this Commonwealth by the said Gaskins, under the said act, in Confederate currency, of the amount of a lien on land in Fauquier county bought by them of the heirs of Cuthbert Bullitt, deceased, which lien had been created thereon by said Bullitt by deed of 20th November, 1790, to secure to the overseers of the poor of Prince William county the payment annually of the interest on £885, Virginia currency, which had been bequeathed by Samuel Jones to the vestry of Dettinger parish, in said county of Prince William, to be put out on real-estate security, and the interest applied to the education of the poor children of the said county, and to annul the deed of release of said land from the said lien, made 10th October, 1863, in pursuance of said act, upon said payment by

the Attorney-General of this Commonwealth, and to subject the said land to satisfy the lien created by the said deed of 20th November, 1790. William E. and James H. Gaskins had sold this land to Stuart and Palmer, in 1863. The lien was an obstacle to the conveyance of title. The said act having been passed, and the payment made, and the release executed under it, they conveyed the land to Stuart and Palmer.

The defendants demurred to the bill and answered it.

The cause having been matured for hearing, the said circuit court decreed the act to be unconstitutional and the payment void, and annulled the deed of release, and directed the land to be sold to satisfy the lien.

From this decree Stuart and Palmer, the defendants below, obtained an appeal and a writ of *supersedeas*.

Opinion states the case.

*Wm. J. Robertson* and *H. R. Gordon*, for the appellants.

*Eppa Hunton*, for the appellees.

LACY, J., delivered the opinion of the court.

The case, briefly stated, is as follows: In August, 1881, the appellees, the county school board of Prince William county, filed their bill in the circuit court of Fauquier county to subject the land of the appellants, Stuart and Palmer, to the lien of a claim due them, in their official capacity, of £885.

Their contention is that one Samuel Jones having bequeathed this amount to the vestry of Dettinger parish, in Prince William county, to be put out upon real estate, and the interest applied to the education of the poor children of said county; that by virtue of an act of the legislature of Virginia of 1785 this fund passed from the hands of the vestry into the hands of the overseers of the poor of the county; that by the act of 1819 the fund passed out of the hands of the overseers

of the poor of said county, and into the hands of the school commissioners of said county, for the education of the poor children. That by an act of the legislature of Virginia in 1863 it passed out of the hands of the school commissioners of the county into the hands of the Second Auditor, to be by him applied to the education of the poor children of Prince William county, as part of the literary fund of the State; and that the money was then collected and paid to the Second Auditor, and by the provisions of the said act the lien on this land was released. That subsequently, by virtue of the act of February 21st, 1872, they, the school board of Prince William, succeeded to all the rights and property held by any person for the benefit of public free schools in the said county of Prince William. That by the act of 1863 the money had been lost, and that the act of 1863 was a so-called law, by a so-called legislature of Virginia; that the so-called legislature of Virginia had no right to pass the act of 1863; that it was *ultra vires*—impaired the obligation of the contract; was unconstitutional, null and void, and the action taken under it of no effect whatever. That the release executed by the Attorney-General of the State, under the provisions of the said act, was of no effect, that the lien still subsisted, and that the sale subsequently made to the appellants, Stuart and Palmer, was subject to their lien, which they were entitled to receive, by virtue of the act of the legislature of 1872, mentioned above, and asking a sale of the land to satisfy the lien.

The appellants, Stuart and Palmer, demurred and answered, and set up their purchase, the act of the legislature of 1863, and the necessity of the sale, by reason of the war, which prevented any annual profit from the fund as it then stood for the benefit of the poor children.

But the circuit court of Fauquier sustained the plaintiffs, and decided in accordance with their contention; held the act of 1863 unconstitutional and void, and decreed a sale of the land

to satisfy the said debt.   Whereupon Stuart and Palmer ap-
plied for and obtained an appeal to this court.

The fund in question having been dedicated by the donor to
the education of the poor children of Prince William county,
to be put out by the vestry in that county, the act of 1785
transferred to the overseers of the poor, under the direction and
control of the county courts, the powers of the vestries, which
had been dissolved; and the custodian of the fund being thus
changed, the same thing was done in 1819; and in 1863 when,
it appearing to the legislature that the fund had become un-
productive as to any annual rent or interest, it was collected
and placed in the hands of the Second Auditor, to be by him
applied in accordance with the will of the donor.

This act of 1863 is declared void—first, because it was done
by the State government while in a state of war with the Fed-
eral government.

But that claim cannot be maintained at this day.   Such acts
of this legislature are expressly recognized by the act of the
restored government of February, 1866.   And in this court it
has been held that the government, which had its seat at Rich-
mond during the late civil war, was a *de facto* government, and
all its acts for the protection of civil rights are held valid, and
all contracts arising out of the laws of such a government will
be enforced to the extent of their just obligation.

Christian, Judge, says in the case of *Dinwiddie County* v.
*Stuart, Buchanan & Co*, 28 Gratt. page 540 : "Such laws and
contracts are not only declared valid and binding by the deci-
sions of this court and of the supreme court of the United
States, but by the express statutes of the restored government
of Virginia, whose constitutionality have never been ques-
tioned in this court or elsewhere."   See, also, the case of *Texas*
v. *White*, 7 Wallace.

We think the act of the legislature of 1863, not being in any-
wise in aid of the war against the United States, but being an

act for the protection and disposition of rights of property, as valid, as the acts of an actual government, as any other act referred to, as affecting the property rights involved in this case.

As to the other question—that the act was unconstitutional, because it impaired the obligation of the contract, and was *ultra vires*—it may be observed, as was contended here in argument by the appellees, that this fund was dedicated to a public use by the donor, and placed in the custody of a body, which afterwards ceased to exist, by reason of changes in the structure of the government, and it became necessary for the Legislature to place this and similar funds in the custody of others; and so, from time to time, these custodians have been changed by the legislature, until it is claimed by the appellees that *they* are entitled to hold it by reason of an act of the legislature; and it is only by virtue of this act of 1872 that the appellees could have any standing in court whatever.

The contention of the appellees would seem to be based upon the idea that this fund, having been once invested, it could never be collected but by the express terms of the contract itself. Cuthbert Bullitt, his heirs and assigns, had the right to pay the debt whenever they thought proper. Their assignees did pay this sum, by authority of the legislature, into the hands designated by law to receive it.

But it is objected that they paid it in Confederate money then greatly depreciated. They paid it in the only currency then in use, and by authority of law. The fund in the then condition of the country was wholly unproductive. It was a fund peculiarly under the control of the legislature, having been dedicated to public uses, and belonging to a class of citizens under the special protection of the legislature. It was a fund which the legislature many years before had been obliged to take charge of to save it from loss. For nearly one hundred years it had been in such hands as the legislature had in its wisdom placed it; and when the legislature, in a time of war and the greatest uncertainty as to the stability of all values, thought

proper once more to stretch forth its hand and place it in safe custody, to be applied, as before, in accordance with the terms of the trust by which it was created, it is said that this act was disastrous, that it resulted in loss, that it impaired the contract, and is unconstitutional and void.   And this claim is sustained by the circuit court.

The act by which the appellees claim to be entitled to this fund is a general act of the legislature, passed subsequent to the act by which the public officer named in the former act had received and applied this fund to the end and in the manner provided by the former law.   At the time of the passage of the law which devolved the rights of the school commissioners upon them, the county school board, as to funds in the hands of the former, the school commissioners, had been superseded as custodians of this fund, and another custodian had been appointed to receive and disburse it.

The fund in question having been dedicated by the donor to a public use, for the benefit of persons who were under the special charge of the legislature, as under an ancient act, referred to above, where the vestries had ceased to be public boards, with public duties, the legislature had substituted another public board of officials to discharge the public duties formerly devolved upon the vestries; so, subsequently the legislature had substituted the last, the overseers of the poor, by the creation and designation of still another public board, to discharge these public duties; and so, still later, according to its discretion, the legislature had designated another public official to substitute the school commissioners, and to perform these public duties as to this public fund, for the benefit of a particular class of persons, under the control and protection of the State government, and of the legislature, as the supreme law-making power of the State.

If this last act had proved advantageous to the fund, and the changed investment had, in the light of after events, turned out to be safe and profitable, there would be none to question the

act. But because the act has proved injurious, it is now claimed to be *ultra vires* and void. The act of the legislature of 1863, having been concerning a public fund, designated for public uses, was entirely within the scope and compass of the general legislative powers of the legislature, devolved upon it by the constitution, and is valid and binding upon the class affected. That the act proved to be unwise in the light of results is immaterial; it cannot be altered or repealed. Under the authority of the actual government of the State the debtors in question paid the debt they owed to the public officer appointed by law to receive it, and by authority of the supreme power of the State their title to the land in question was perfected under the very terms of their contract, which provided that they should have the right to pay this debt at their pleasure.

Third persons, acting under the ægis of the State, have purchased this land. They paid a valuable consideration, as agreed on at the time, which was then equal in value to what they received, and their rights are to be protected, and they cannot be required to pay a second time, or surrender their land, upon the assumption that the legislature of Virginia, in 1863, was only a nominal body, without lawful authority. That body at that time had the power to enforce its enactments, and did enforce them against all comers. The government then existing was overthrown, and a new government established in its stead, under which we now live; and among its first acts was an act declaring all such domestic acts valid and binding, and its acts of such a character and the contracts made thereunder have been enforced to the present time by all the courts when they have been called in question, both State and Federal.

The case of the *Bank of Old Dominion* v. *McVeigh*, 20 Gratt., has been much relied on to sustain the ruling of the circuit court in this case. But an examination of that case will show a very different case from this. The fund in that case was in no sense a public fund, dedicated to public uses, which had been from its creation under the control and in the custody of public

officials of the State, created and empowered by the legislature. The fund in that case was a debt due to a person (a corporation) outside of the State, so far as the powers of that legislature extended in the exercise of their actual powers. The debtor was a citizen of the State, within the lines of the actual government, and under the sanction of the legislature the debtor was authorized to pay the debt to some other person than the creditor; and it was not paid to the creditor at all, nor to any person authorized by it to receive the debt. This payment was held by a majority of this court to be no payment of the debt.

That case bears but little analogy to this, where the legislature changed the custodian of a public fund, appointing one public officer to substitute another in the discharge of a public duty, and authorized the payment of the debt, and its application in accordance with the terms of the instrument by which it was created. This was the exercise by the State of such paternal or tutorial power over rights and interests of the poor children of Prince William county as appears to be clearly within the power of the sovereign, to be exercised by general laws, and under the peculiar circumstances of this case, by a special act of the legislature.

It is an agreeable and pleasing reflection, in contemplating the results of this case, that if, in the exercise of this paternal solicitude by the State, anything appears to have been lost to the poor children of Prince William county as wards of the State, the growth of a wider benevolence in the administration of the offices of the State toward this class of her citizens has more than compensated the loss of this fund for the education of the poor children of that county, in the widespread and enduring blessings of a general free-school system erected and ordained by the State in the general exercise of this paternal power.

But it is not our province to look into the motives of the legislature. Courts are not at liberty to inquire into the proper

exercise of power by the legislature in a case where the latter have been acting within their constitutional limits. They are bound to presume that the legislatures have exercised the proper discretion. Such an exercise of power within its constitutional limits, it has been held, is so conclusive that, though the legislature should, from any cause, do injustice to an individual, there is no court or other power in the government that can apply a remedy or administer relief. And it is not in the power of any court to say that a legislative act is void because it has not proven in after time to be judicious.

We think the act of the Legislature in question valid and binding, and the decree of the circuit court of Fauquier, declaring the same unconstitutional, void and of no effect, is wholly erroneous, and the same must be reversed and annulled.

FAUNTLEROY, J., and RICHARDSON, J., concurred with LACY, J.

LEWIS, P., dissenting, said:

I dissent from the opinion which has just been read. To my mind the propositions it announces are no less novel than startling, ignoring, as it does, the constitutional safeguards of the property rights of the citizen, and that, too, on the ground that those whose rights are alleged to have been invaded are incompetent to act for themselves. I had supposed that the disabled were especially entitled to the "protection of the laws." But the opinion just read seems to assume that to a case like this the fundamental guarantees do not extend; that the beneficiaries here are the wards of the State, and that therefore their rights of property are left to the arbitrary discretion of the legislature.

It is said, in the first place, that the bequest in question was for public purposes. But if by this it is meant to say that the State in its political capacity was beneficially interested as a party under the will of Samuel Jones, and could therefore sub-

stitute, in place of the testator's directions, the will of the legislature, the proposition is unfounded. The fact that the object of the bequest was the education of a certain class, in a particular community, did not make the trust in its character any the less private. This is well-settled law, and need not be dwelt upon. A contrary principle, says Chief Justice Marshall, has never been asserted or recognized. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 637, 670. Here the estate bequeathed was the testator's own property—not dedicated to the public, but to be secured and its income appropriated in the manner and for the purposes directed by the will. The bequest was therefore plainly within the protection of the law securing the rights of private property, and the act in question, impairing the rights of the parties, as plainly unconstitutional and void.

In England and in this country the right to private property has always been regarded as a sacred right, "not introduced," as was said in an early case, "as the result of princes' edicts, concessions, and charters; but it was the old fundamental law, springing from the original frame and constitution of the realm." *Nightingale* v. *Bridges*, 1 Shower's Reports, 138. Its protection is guaranteed by *Magna Charta*, and in some form or other by the constitutions of the various States and of the United States. "It may be received," says Chancellor Kent, "as a proposition universally understood and acknowledged throughout this country that no person shall be taken or imprisoned, or disseized of his freehold or estate, or exiled or condemned, or deprived of life, liberty, or property, unless by the law of the land or the judgment of his peers." 1 Kent's Com. part iv, marg. p. 13. "By the law of the land," said Mr. Webster in the Dartmouth College case, whose definition is often quoted, "is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society. Everything

which may pass under the form of an enactment is not therefore to be considered the law of the land."

The constitution provides that the legislature shall confer on the courts the power to direct the sale of estates of infants and other persons under legal disabilities, but shall not by special legislation grant relief in such cases or in any other case of which the courts or other tribunals may have jurisdiction. Article V, section 20. The same provision is contained in the constitution of 1851, article IV, section 35. But subject to this restriction, the legislature may by special enactment adopt measures for the management and control of the estates of persons not *sui juris*, in cases where judicial inquiry is not essential, and the interests of such persons require it. Cooley's Constitutional Limitations (fourth edition), marg. page 97; Potter's Dwarris on Stats. 488. This is done in the exercise of a tutorial power, as *parens patriæ* or universal trustee, which under our system of government devolves upon the legislature. *Gallego's ex'ors* v. *The Attorney-General*, 3 Leigh, 450–482; *Savings Bank* v. *The United States*, 19 Wall. 227–239. But the power is to be exercised for the benefit of the *cestuis que trust*, and never to the prejudice of their substantial rights. And this is abundantly shown by the authorities relied on by the appellants themselves.

Thus, in the leading case of *Rice* v. *Parkman*, 16 Mass. 326, decided in 1820, a private act of the legislature of Massachusetts, authorizing a guardian to sell the real estate of his wards, and directing the proceeds to be put at interest, on good security, was held to be valid, on the ground that the power exercised was not judicial in its character, and rested in the legislature "as the general guardian and protector of those who are incompetent to act for themselves." But while this is so, " no one imagines," said Chief Justice Parker, in delivering the opinion, "that under its general authority the legislature could deprive a citizen of his estate, or impair any valuable contract in which he might be interested." To the same effect

is *Cochran* v. *Van Surlay*, 20 Wend. 365, in which case a similar
act of the legislature of New York was sustained by the court
for the correction of errors. The act was held to be clearly
within the powers of the legislature, as *parens patriæ*, to pre-
scribe such rules and regulations as it may deem proper for the
superintendence, disposition, and management of the property
and effects of infants, lunatics, and other persons who are in-
capable of managing their own affairs. "But even that power,"
said the Chancellor, speaking for the court, "cannot constitu-
tionally be so far extended as to transfer the beneficial use of
the property to another person, except in those cases where
it can be legally presumed the owner of the property would
himself have given the use of his property to the other, if he
had been in a situation to act for himself." So, upon the same
principles, in *Stanley* v. *Colt*, 5 Wall. 119, an act of the legisla-
ture of Connecticut was sustained by the supreme court of the.
United States, which authorized a sale of certain real estate
which had been devised for charitable purposes. But the legis-
lature was careful to provide that the proceeds should be in-
vested in interest-bearing bonds, to be secured by mortgage on
real estate of double the value of the sum invested; and that
the interest should be applied for the same purposes and in the
same manner as the income of the real estate was by the will
directed to be appropriated. The same doctrine has been held
in numerous cases. *Sohier* v. *The Mass. General Hospital*, 3
Cush. 483; *Blagge* v. *Miles*, 1 Story, 426; *Bambough* v. *Bam-
bough*, 11 S. & R. 191; *Davison* v. *Johonnot*, 7 Met. 388; *Doe* v.
*Douglass*, 8 Blackf. 10; *Leggett* v. *Hunter*, 19 N. Y. 445; *Norris*
v. *Clymer*, 2 Barr 277.

In *Wilkinson* v. *Leland*, 2 Pet. 627, also relied on by counsel
for appellants, an act of the legislature of Rhode Island, con-
firming a sale of real estate by a foreign executrix for the pay-
ment of debts of the testator, was held to be valid, the same
not being a judicial act in its character, but the exercise of
legislation. But in delivering the opinion of the court Mr.

Justice Story took occasion to use this emphatic language: "The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least, no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights so vital to their security and well-being without very strong and direct expressions of such an intention." And in *Calder v. Bull*, 3 Dall. 386, Mr. Justice Chase said: "I cannot subscribe to the omnipotence of a State legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the State. * * * There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power; as to take away that security for personal liberty or private property for the protection whereof the government was established."

Applying these principles, it is plain, I think, that the debt in question has not been discharged. The record shows that, by the contract of the parties, it was payable in gold or its equivalent, and as directed by the will was amply secured by a mortgage on real estate. Upon the application to the legislature, not of the *cestuis que trust*, or any one representing them, but of the debtors themselves, and without any reason save the convenience of the latter, leave was granted them to discharge the debt to the Second Auditor, as a substituted trustee or agent, by a payment in Confederate currency, worth at the time, perhaps, not more than one-fifteenth of its face value. And the money, when received, to be invested, not necessarily in real estate or other safe securities, but at such time and in such manner as the substituted trustee might see fit. In point of

fact, he did not invest it all, and the fund was lost by the result of the war. If this did not impair the substantial rights of the parties, it is impossible to conceive how rights can be impaired. What difference, then, does it make that, by the contract of the parties, the obligors had the privilege to pay the debt when the act was passed? The contract, as I have said, was to pay, not in a depreciated currency, but in lawful money of the United States, and nothing else. And what difference does it make that, when the act was passed, the county of Prince William was in the occupancy of the Federal troops? If such was in fact the case, it only showed that the fund, if collected, could not then be used for the purposes designed by the testator, and that its collection, therefore, could in no wise promote the interest of the *cestuis que trust.*

But there is an additional consideration, which seems to me conclusive of the case, and that is that the act in question is in contravention of the constitution of the United States, which inhibits the States from passing any law impairing the obligation of contracts, or making anything but gold or silver coin a legal tender in payment of debts. Article I, section 10. The act, it is true, does not expressly authorize a payment in Confederate currency, but such undoubtedly was the intention of the legislature, inasmuch as no other currency was in circulation within the Confederate lines. If the intention were otherwise, then the payment, which was made in that currency, was not pursuant to the act, and the debt has not been discharged. Such was the view taken by this court of an act, passed during the war, authorizing payment to a branch bank, if within the Confederate lines, of antecedently contracted debts due the mother bank within the Federal lines. *Bank of the Old Dominion* v. *McVeigh*, 20 Gratt. 457. Under that act certain notes due the mother bank, which had been executed before the passage of the act, were paid in Confederate currency at a branch bank within the Confederate lines. In a suit on the notes by the bank, after the war, the defendant in his defence relied on

the act. The circuit court sustained the defence, but the judgment was reversed. Judge Christian, in delivering the opinion, said: "It is difficult to conceive how any law could be framed which more plainly and palpably violates that provision of the constitution of the United States which declares that no State shall pass any law impairing the obligation of a contract. * * * It is true the act does not, in terms, authorize payment in Confederate money; but it is notorious, and is part of the current public history of the times, that the only currency of the country, within the lines of the Confederate armies, was Confederate treasury notes, and it is equally a part of the current public history that such currency was greatly depreciated at that time. * * * The act either authorized the payment in Confederate currency, or it authorized the payment in legal currency. If the authority was to pay in legal currency, then the defendant in error [the debtor] has not complied with the requirements of the act; and if the act (as construed by the court below) authorized the payment of the debt in Confederate currency, which was contracted to be paid in gold or its equivalent, then it is clearly unconstitutional and void, because it is an attempt to make a worthless currency a legal tender. In either or any view of the case the debt has not been discharged, but is still due and unpaid." It is difficult to see how any language could be more appropriate than this to the case in hand.

It is insisted, however, that the fund became subject to the absolute control of the Legislature because the bequest, which was originally void for uncertainty, acquired vitality only by the action of that body. But this position is unsupported by principle or authority. The answer is that the legislature having seen fit to interpose and give effect to the charity, without reservation, the parties in interest thereby acquired vested rights which could not be impaired by subsequent legislation. A similar argument, in respect to a legislative grant, was unsuccessfully urged in *Terrett* v. *Taylor*, 9 Cranch, 43, in response

to which the court said: "We have no knowledge of any authority or principle which could support the doctrine that a legislative grant is revocable in its nature, and held only *durante bene placito*. Such a doctrine  *  *  *  is utterly inconsistent with a great and fundamental principle of a republican government—the right of the citizens to the free enjoyment of their property legally acquired." See also *Fletcher* v. *Peck*, 6 Cranch, 87–133; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Regents of the University* v. *Williams*, 9 G. & J. 365; Cooley's Const. Lim. (fourth edition), 274, and cases cited.

A case in point is *Brown* v. *Hummel*, 6 Penn. St. 86. There certain estate was devised to establish a charity for the education of poor and orphan children. The will appointed trustees, and contained instructions for the perpetuation of the trustees and the general management of the trust. It also directed that an orphan house should be erected, and that no part of the estate devised should be sold or severed from the orphan house. After the testator's death, by an act of the legislature, the trustees were incorporated. And afterwards an act was passed providing for the appointment of trustees under the will in a manner different from that directed by the will, and authorizing a sale of a portion of the real estate. This act was assailed as an unwarranted interference with the rights of the parties, and it was unanimously held by the supreme court of Pennsylvania to be unconstitutional and void. The court said: "That the grant of a corporation for charitable purposes is a private grant, and in law considered and protected as a contract, is so fully established by authority as to require only a glance at the subject." And it further said: "But, in addition to excluding the old trustees and the principal from their stations, the act in question, on its face, alters the testator's will. Where this power was or is derived we are at a loss to perceive. If the legislature, by *ex-parte* enactment, can alter the will of a private individual, whose will shall escape? On whose will shall the hand of legislative innovation next be laid? What

private charity will next be disturbed and invaded? If the legislature can alter one man's will, by license of the constitution, they can alter the will of every man."

These remarks are no less applicable to the present case. By the will of Samuel Jones, the fund was directed to be put at interest, and secured on real estate. By the act of 1863 no such direction was given, although authority was given to collect the fund. In consequence of that act the fund was lost, and the loss is now held to fall on the innocent and no less-deserving beneficiaries. I do not so read the constitution. I concur with the circuit court, that the act is unconstitutional, null and void.

It seems to be supposed, however, that the loss sustained has been more than counterbalanced by the benefits derived from the subsequent establishment of the free-school system in the county of Prince William. This may be true, and the argument would be entitled to weight if it were at all germane. But the doctrine of set-off has no application to a case like this.

I will only add that, in my opinion, the remaining objections to the validity of the act are not well founded. It must be held, I think, that the county of Prince William, during the entire period of the war, was subject to the jurisdiction of the State government established in this city. And there is nothing in the act, either in its object or by reason of the character of that government, to exclude it from the operation of the rule laid down by the supreme court of the United States in *Keith* v. *Clark*, 97 U. S. 454, and other cases there cited.

I think the decree should be affirmed.

HINTON, J., concurred with LEWIS, P.

DECREE REVERSED.