## Wytheville.

### RUSSELL'S EX'RS V. PASSMORE, JR., AND OTHERS.

#### June 10, 1920.

1. TRUSTS AND TRUSTEES—*Parol Trust—Evidence to Establish.*—
The standard of proof required to establish a parol trust of
personalty demands clear and unequivocal evidence. The
standard is certainly no higher than that applicable to parol
trusts of real estate, and as to the latter, the rule is that the
declaration of the trust must be unequivocal and explicit and
established by clear and convincing testimony.

2. TRUSTS AND TRUSTEES—*Parol Trust—Bill and Evidence in Suit
to Establish Parol Trust Held Sufficient.*—In a suit to establish
a parol trust in bank stock the bill alleged that the stock was
placed in the custody of the decedent of defendants subject
to the express trust that the stock and the proceeds thereof
should be used for the benefit of complainant; that the trustee
accepted the trust and promised the donor that he would
faithfully execute it.

   *Held:* On demurrer that the facts set out in the bill were suf-
ficient to establish that the trust was created and accepted,
and that the same was true of the evidence in the cause.

3. TRUSTS AND TRUSTEES—*Revocation of Trust—Case at Bar.*—In
the instant case, in a suit to establish a parol trust in bank
stock, the bill alleged that the stock was placed in the cus-
tody of the decedent of defendants subject to the express trust
that the stock and the proceeds thereof should be used for the
benefit of complainant; that the trustee accepted the trust and
promised the donor that he would faithfully execute it. It
appeared from the evidence that the stock was placed in the
custody of the trustee to be held by him in the event of the
death of the donor for the use and benefit of the complainant.

   *Held:* That the interest vested in the complainant, under the
trust as alleged in the bill, was irrevocable, but that the
trust as disclosed by the evidence was not irrevocable.

4. TRUSTS AND TRUSTEES—*Revocation of Trust—Case at Bar.*—The
gift of the beneficial ownership of the bank stock to the com-
plainant, as set out in the preceding syllabus, was not a com-
plete unconditional gift *inter vivos*, as would have been the

case if the facts had been as alleged in the bill. The proof disclosed that the gift was conditioned by necessary implication upon its remaining unrevoked at the death of the donor, so that by the terms of the declaration of trust, the beneficiary took a vested equitable interest thereunder, but subject to be divested by revocation by the donor at any time thereafter previous to his death.

5. TRUSTS AND TRUSTEES—*Revocation—Completed Trust.*—A completed trust without reservation of power of revocation can only be revoked by consent of all the *cestuis.* If a voluntary trust for the benefit, wholly or partly, of some person or persons other than the grantor, is once perfectly created, and the relation of trustee and *cestui que trust* is once established, it will be enforced, though the settlor has attempted to revoke it by making a secondary voluntary settlement of the same property, or otherwise, or if the estate, by some accident, afterwards becomes revested in the settlor. In all these cases the first perfectly created trust will be upheld, with all its consequences. A trust once created and accepted without reservation of power can only be revoked by the full consent of all parties in interest; if any of the parties are not in being, or are not *sui juris,* it cannot be revoked at all.

6. TRUSTS AND TRUSTEES—*Parol Trust with Right of Revocation—Gifts Causa Mortis.*—A parol trust in personalty, which by the very terms of the declaration of trust was subject to revocation by the donor prior to his death, is good as a gift *causa mortis,* or is good as a gift by way of an express trust, and in the absence of fraud, mistake, or misunderstanding, is enforceable after the death of the donor if left unrevoked at his death. Although the power of revocation is reserved, the trust is as good and effectual as if irrevocable, until the power is exercised.

7. TRUSTS AND TRUSTEES—*Revocation—Implied Reservation of Power of Revocation.*—Although a trust completely created and containing no power of revocation is not revocable by the creator without the consent of the beneficiary, it is not necessary that the power of revocation be express. If the power of revocation exists by necessary implication under the terms of the gift, it may be exercised just the same as if expressly reserved.

8. TRUSTS AND TRUSTEES—*Gift of Subject in Hands of Third Person—Whether Gift is Testamentary.*—The gift of a subject in the hands of a third person as trustee, the trust having been perfectly created by action which included the acceptance of the trust by the trustee in the lifetime of the donor, condi-

tioned to take effect in absolute right in case of the death of the donor, is not testamentary in its character and can be enforced although not evidenced as required by the statute of wills. *Sterling* v. *Wilkinson*, 83 Va. 791, 3 S. E. 533, disapproved.

9.   TRUSTS AND TRUSTEES—*Gift of Subject in Hands of Third Person —Whether Gift is Testamentary—Conditional Equitable Assignment—When Title Passes.*—A valid equitable assignment may, of course, be conditional. And if the condition be a subsequent condition, although it has power to divest the equitable title ·to the gift, yet if that condition does not arise, the title, by relation, is regarded as complete and absolute from the time of the gift. And when such condition involves a possible revocation of the gift by the donor in his lifetime, on his death without having exercised such power, upon the same principle as that whch is involved in gifts *causa mortis,* the equita- ·ble title does not await until after the death of the donor to pass to the beneficiary, so as to become a testamentary disposition, but is regarded as having passed in the lifetime of the donor at the time of the gift—where the gift is in proper form to be effectual, as, of course, is unquestionably true where the possession of the subject of the gift is given by the donor to a trustee who accepts the trust, all in the lifetime of the donor.

10.   GIFTS—*Revocation of Gift Causa Mortis.*—A gift *causa mortis* may be revoked by the donor after it is made at any time before his death, and it will also be revoked by operation of law if the donor recover from the particular illness or peril which existed at the time the gift was made and was the cause of the gift, or if there occurs a deficiency of assets necessary· to pay the debts of the deceased donor.

11.   GIFTS—*Gifts Causa Mortis—Peril of Donor.*—Where the proof does not disclose the existence of the requisite peril or the illness of the donor at the time of the gift, the gift is not good as a gift *causa mortis.*

12.   RES GESTAE—*Trusts and Trustees—Declaration by Creator of Trust.*—Where the main fact involved was whether a trust relationship, unquestionably previously established, did or did not exist at a given subsequent time, the *bona fide* conduct and accompanying declaration of one of the parties to that relationship are themselves facts which have a legitimate bearing, and are admissible in evidence as a part of the *res gestae* on that subject; and such evidence is also admissible to show that the donor had changed the beneficiary of the trust, having at first made his oldest son the beneficiary and subsequently di-

rected the trustee to hold the subject of the trust for the benefit of all of his children.

13. TRUSTS AND TRUSTEES—*Trust Incapable of Taking Effect—Disposition of Subject Matter.*—Where the objects of a trust are so ineffectually declared as to be wholly unascertainable, so that the trust is incapable of taking effect, neither the trustee nor his executors can hold the subject of the trust. Under such circumstances, upon the death of the donor, the subject of the trust passes to those who would take under the disposition of the law.

14. TRUSTS AND TRUSTEES—*Parol Trust—Sufficiency of Evidence to Establish a Change in the Beneficiaries—Case at Bar.*—In the instant case the evidence was sufficiently unequivocal, explicit, clear, and convincing to establish that, after the creation of a trust, and prior to the death of the donor, the trust as originally created had been partially revoked by the donor and a different and enlarged trust, as to its objects, had been created by the donor by direction to the trustee to hold the subject of the trust for the benefit of all of his children, instead of for the benefit of his oldest son, and that the trustee had accepted the latter trust.

15. TRUSTS AND TRUSTEES—*Parol Trust—Evidence to Show Change in Beneficiary—Declarations and Conduct of Trustee and Donor.* —Where the question at issue was whether a donor had changed the object of a parol trust of personalty by making all of his children beneficiaries instead of his oldest son, testimony of a witness to a statement of the trustee to that effect, although admissible as evidence, should be received with great caution, but when corroborated by the conduct of the trustee in making remittances to other children of the donor, and further corroborated by the death bed declaration of the donor to the same effect, the cumulative evidence becomes unequivocal and clear and very convincing.

16. FRAUD—*Evidence of Fraud—Evidence to Show Fraud by the Dead.*—Fraud or breach of trust ought not lightly to be imputed to the living; for the legal presumption is the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes and violate the sanctity of the grave, unless the evidence of fraud be clear, beyond a reasonable doubt.

17. TRUSTS AND TRUSTEES—*Statute of Frauds—Statute of Limitations—Laches—Enforcement of Parol Trust.*—While the statute of frauds and the statute of limitations will not bar a suit in equity to enforce an express continuing trust, although dependent upon parol evidence for its establishment; yet prescrip-

tion, or laches in the assertion of it, or lack of sufficient evidence of an unequivocal and convincing character to clearly and satisfactorily establish the trust, will operate to defeat its enforcement.

18.  TRUSTS AND TRUSTEES—*Parol Trust—Fraud of Trustee—Case at Bar.*—In the instant case, a suit to establish a parol trust, where both the donor and trustee were dead, while under ordinary circumstances the failure of the trustee to make or leave at his death any memorandum as to the trust, in view of his business habits and high character, would carry great weight as evidence that the trust had terminated before his death, such considerations are, under the peculiar facts of the case, stripped of most, if not all, of their evidential value, as the very reason for the trust demanded the utmost secrecy consistent with the knowledge of it by the donor and donee, and by those to whom the donor confided its existence.

19.  TRUSTS AND TRUSTEES—*Investment of Subject of Trust—Election.*—Where the subject of a trust is money and the trustee invests the money in property, the beneficiaries of the trust have the option to hold the trustee or his estate liable for the money with interest, or the property in which it was invested, with all actual profits, where the rights of no third person intervene; that is to say, equity, in such case, at the option of the beneficiaries, will impress upon the investment the same trust as originally adhered to the money which was used to make the investment.

20.  TRUSTS AND TRUSTEES—*Parol Trusts—Beneficiaries—Evidence—Case at Bar.*—While in the instant case, a suit to establish a parol trust, there might have been some doubt as to whether under the terms of the declaration of trust the youngest son of the donor was a beneficiary, the conduct of the donor, the trustee, and a witness present at a deathbed statement of the donor in regard to the trust, were convincing that the youngest child was included among the beneficiaries. The evidence on the subject measured up to the standard of the character of proof required to establish a parol trust, and established the fact that the trust, as it existed at the death of the donor, was for the benefit of all of his children.

21.  TRUSTS AND TRUSTEES—*Enforcement—Uncertainty as to Beneficiaries.*—In an action to establish a parol trust, the fact that the evidence left it in doubt whether the youngest son of the donor was included among the beneficiaries, would not render the trust incapable of enforcement.

22.  TRUSTS AND TRUSTEES—*Beneficiaries—Certainty.*—The certainty as to the designated objects of a trust which the law requires

to make the trust enforceable in a court of equity, is not certainty as to "all" of the objects or beneficiaries of the trust. The trust may be good as to designated beneficiaries, although void with respect to certain beneficiaries not designated with sufficient certainty to identify them.

23. TRUSTS AND TRUSTEES—*Statute of Frauds.*—The statute of frauds, (Code 1887, sec. 2840, subsec. 7; Code 1919, sec. 5561) is not applicable to an express trust in personality, although created by parol; nor is such statute applicable even to express parol trusts in realty.

24. TRUSTS AND TRUSTEES—*Statute of Limitations.*—The statute of limitations is not applicable to a continuing express parol trust, of which there has been no unequivocal denial or repudiation by the trustee. Although the statute of limitations is applicable in favor of the trustee to certain trusts other than express trusts, as to express trusts, which have not terminated, the rule is different.

25. TRUSTS AND TRUSTEES—*Action to Establish Trust—Appointment of Substituted Trustee—Case at Bar.*—A suit may be maintained by the beneficiaries in their own name to establish a parol trust in their favor in certain bank stock against the executors of the deceased trustee, and it is not necessary that the court appoint a substituted trustee in the place of the deceased trustee to bring the suit.

26. TRUSTS AND TRUSTEES—*Appointment of Substituted Trustee—Case at Bar.*—The appointment of a substituted trustee is in every case a matter of discretion in the court, having in view the consideration of whether the circumstances render such appointment necessary or desirable. It is a matter which does not go to the jurisdiction of the court to take cognizance of the cause, but pertains to its action in the course of its exercise of its jurisdiction. And in the instant case, when the guardian can, under the guidance of the court if need be, exercise all of the powers which were conferred on the deceased trustee, even those involved in the discretion given him of using the fund as he "saw fit" for the benefit of the *cestui que trust,* there is manifestly no necessity for the substitution of a trustee.

27. TRUSTS AND TRUSTEES—*Parol Trust in Personality—Appeal and Error—Harmless Error.*—In a suit to establish a parol trust in personality, a decree is erroneous which, while it establishes the same trust as that alleged in the bill, in so far as the trustee and the subject of the trust were concerned, established it for the benefit of more persons as objects of the trust than were alleged in the bill. The bill should have been

amended under Acts 1914, p. 641, Code 1919, sec. 6104, so as to make its allegations of fact conform to the proof in the cause in the particular in question, before the decree was entered. The error, however, was harmless, as the failure to amend the pleadings did not affect the substantial rights of the parties.

28. TRUSTS AND TRUSTEES—*Commissions of Trustee.*—The English rule at common law was very strict on the subject of commissions, and under it a trustee was not entitled to any compensation for his personal or professional services, in the absence of express provision for compensation in the terms of the trust. The accepted rule in this country at the present time, however, is, in case the matter is not otherwise regulated by statute, for courts of equity to exercise just discretion, and make or withhold allowance as they consider the peculiar circumstances require.

29. TRUSTS AND TRUSTEES—*Commissions.*—In a suit to establish a parol trust in personalty against the executors of the deceased trustee, an allowance of commissions to the trustee to the extent of five per cent. on the disbursements actually made by the trustee in part execution of his trust was not erroneous, but the decree was erroneous in so far as it made any further allowances of commissions, as the residue of the trust was not executed by the trustee or his executors, nor intended to be executed by the latter.

30. TRUSTS AND TRUSTEES—*Compound Interest.*—Compound interest will be charged against an executor or trustee where a testator expressly directs an accumulation, or where trust moneys are used by a trustee for his own benefit in carrying on his own trade, but ordinarily the trustee or executor is not chargeable with compound interest.

Appeal from a decree of the Circuit Court of Charlotte county. Decree for complainants. Defendants appeal.

*Affirmed.*

This suit in equity involves the question of the existence of an express parol private trust, created by a gift. The subject of the trust, if it exists, is personal property. The donor was George E. Passmore, the father of appellees, who were plaintiffs in the court below. The trustee was

61

George B. Russell, the testator of appellants, who were defendants in the court below.

The donor had only four children, two boys, George E. Passmore, Jr., and Washington Passmore, and two girls, Marion Passmore and Ellen Passmore, all infants of tender years, the first named being the oldest, and being only five or six years of age at the time the original trust hereinafter mentioned was created, and only about thirteen or fourteen years of age when this suit was instituted.

The suit was instituted in the early part of the year 1919. The plaintiffs, the said four infant children, sued by their guardian as their next friend. The bill alleges that certain bank stock (twenty shares as stated in the original bill) in the possession of the defendants, and which was held by their testator in his own name at the time of his death, was in truth the subject of an express trust which was created in the lifetime of both the said donor and trustee, to-wit, in the fall of 1910, for the benefit of one of said infant plaintiffs, to-wit, George E. Passmore, Jr., in the following manner namely: That "the said George E. Passmore, in company with one Charles Osborne, went to see the said George B. Russell, deceased, and placed in his custody for the benefit of your complainant, George Edward Passmore, Jr., twenty shares of the bank stock of the State Bank of Charlotte County, Incorporated, subject to the express trust that said stock and the proceeds thereof should be used for the benefit of your complainant, George Edward Passmore, Jr. That said George B. Russell, deceased, accepted said trust upon said conditions and expressly promised the said George E. Passmore that he would faithfully execute said trust; thereupon, said stock was caused to be transferred upon the books of the bank to the said George B. Russell, who thereafter held the same in his own name and collected all dividends thereon de-

clared" (in his lifetime) "subsequent to the fall of 1910."
The bill also alleges the death of George E. Passmore in the
spring of 1911; of George B. Russell in March, 1918, the
latter leaving a will which merely directed that all of his
"just debts and funeral expenses be paid as promptly as
practicable;" and gave, devised and bequeathed "all" of his
"property, both real and personal of every kind and descrip-
tion" to his wife, one of the executors named in the will,
who qualified as such along with the other executor so
named. The bill further alleges what dividends on the
stock were collected by the said George B. Russell prior
to his death, and prays that the executors aforesaid be re-
quired to transfer said stock to said George E. Passmore,
Jr., or some one for him, and "to account for the dividends
collected by their testator as aforesaid," with interest, and
for general relief.

The bill states, "That the other children of George E.
Passmore are made parties complainant to this bill in order
that they may be before the court should it appear that
they have any interest in said trust property or the pro-
ceeds thereof."

There was a demurrer to the bill on grounds which raise
the questions which are made the basis of some of the as-
signments of error and which are disposed of in the opinion
below.

The demurrer was overruled.

The executors answered, denying that the alleged trust
or any trust whatsoever was at any time created by the
said alleged donor or accepted by the said George B. Russell.

There were depositions of witnesses taken and filed in
behalf of the plaintiffs and defendants. The proof de-
veloped the fact that the bank stock aforesaid consisted
of fifty, instead of twenty shares, and by leave of court the
bill was amended so as to so allege. Of the proof in the

cause it is deemed sufficient to make the following further statement: The evidence on which the plaintiffs rely as creating a trust is wholly parol testimony. The character of the testimony will appear from what is said below concerning it. . It must be especially noted that the proof discloses certain features of fact which make a case which is different from that alleged in the bill.

The initial transaction by which the character of a trust was imposed upon the gift in question occurred on September 8, 1910. Mr. Osborne, a witness for the plaintiffs, testifies in regard to this transaction as follows:

### In Chief.

" * * * I went to Drakes Branch with Mr. George E. Passmore to see Mr. Russell, Mr. Geo. B. Russell" (this was on September 8, 1910, as appears from other testimony in the cause), "and Mr. Passmore asked Mr. Russell to take some bank stock to be held by him in the event of the death of Mr. Passmore, the proceeds of which were to be used as Mr. Russell saw fit for the benefit of Geo. E. Passmore, Jr.

"Q. Please state briefly what took place on this occasion?

"A. *Mr. Passmore gave me a package of money*, amount of which I do not know, which he instructed me to give to Mr. Russell, after which Mr. Passmore gave Mr. Russell what he claimed to be bank stock" (which other testimony in the case identifies beyond question as the fifty shares of bank stock mentioned in the bill as amended), "and *Mr. Russell gave Mr. Passmore the package of money* which I had just *given to him*."

\*    \*    \*    \*    \*

*On Cross-Examination.*

"Q. You have testified that, as you understand, this bank stock was to be held by Mr. Russell *in the event of Mr. Passmore's death,* is that correct?

"A. Yes, sir, *that is correct.*

"Q. *Then upon what terms,* if you know, *was it to be held prior to his death?*

"A. *I do not know.*

"Q. There was nothing said about that?

"A. Nothing said about that.

"Q. After the death of Mr. Passmore, I understand that the proceeds were to be used as Mr. Russell saw fit for the benefit of Geo. E. Passmore, Jr.?

"A. Yes, sir, I so understood."

"Q. It was only after the death of Mr. Passmore?

"A. Yes, sir, I understood it."

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Did you understand that Mr. Russell was to have full discretion in the manner that the money was to be used as Mr. Russell saw fit for the benefit of Passmore's son?

"A. I understood that Mr. Russell was to use *this money* as he saw fit for the best interest of the child.

"Q. \* \* \* was there anything said about the termination of the trust?

"A. It was not.

"Q. Was there anything said about what periods the money was to be paid for this son?

"A. None.

"Q. And nothing was said about the return of the principal or corpus?

"A. Nothing.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Do you know why Mr. Passmore desired to turn the stock over to Mr. Russell upon the conditions which you have described?

\*    \*    \*    \*    \*    \*    \*    \*

"A. Mr. Passmore stated to Mr. Russell that he wanted to turn this stock over to him to make sure that this boy got the benefit of it; that the boy's grandfather, Mr. W. C. Winn, would get it away from him if possible to do it. \* \* \* \*

"Q. Was there any promise made by Mr. Russell as to what he would or would not do with this bank stock?

"A. Mr. Passmore requested Mr. Russell to take this stock, to hold it and use it for this boy; Mr. Russell agreed that he would do it.

"Q. Can you recall just what was said?

"A. I do not think I could recall the exact words that were used." \* \* \* \*

*On Re-Direct Examination.*

"Q. Relative to the reason why Mr. Passmore desired to create this trust for the benefit of his son, I will ask you, in this connection, if you know whether or not Mr. Passmore had any confidence in his father-in-law, Mr. Winn, and whether this had anything to do with the reasons for creating the trust?

"A. I have heard Mr. Passmore state that he did not have any confidence in his father-in-law, Mr. Winn."

\*    \*    \*    \*    \*

"Q. Mr. Winn, the father-in-law of Mr. Passmore, and Mr. Passmore were on bad terms at this time, were they not?

"A. 1910? Yes, sir.

"Q. And it was the desire of Mr. Passmore to make some provision for his son, Geo. E. Passmore, Jr., and make it in such a way so that Mr. Winn could not possibly know anything about it?

"A. He so expressed himself on many occasions.

"Q. And for that reason it was desired by Mr. Passmore that this matter should be kept in secrecy?

"A. Yes, sir."

\*        \*        \*        \*        \*        \*        \*        \*

It appears in evidence that said donor died March 8, 1911; that the trustee, Russell, died in May, 1918.

It appears from the testimony of Osborne that both the said donor and trustee were his "close friends," and that with the exception of an interval of about twenty-one days from December 26, 1910, to January 15, 1911, when he was in a hospital in Richmond, the witness, after September, 1910, frequently saw the said donor during his lifetime, and also the said trustee, Russell, during his lifetime, but neither of them said anything further to this witness on the subject of the trust after September 8, 1910.   Indeed, no one mentioned this matter to this witness until the summer of 1918, after the death of the trustee, Russell, when Mr. Peters, who was one of the administrators of said donor, who died intestate, first mentioned the matter to witness.   The material testimony of this witness on this subject is as follows:

"Mr. Peters approached me at the corner of a store in Keysville sometime during the summer of 1918, after the death of Mr. Geo. B. Russell, and asked me what I knew about the stock Mr. Passmore had given to Mr. Russell, or words to that effect \* \* I replied by asking Mr. Peters what he knew about it, and his statement to me at that time was that Mr. Passmore a few hours before his death told him that Mr. Geo. B. Russell had some bank stock belonging to him which he was holding for the benefit *of his children*, after which I told about this stock having been turned over to Mr. Russell during the fall of 1910."

\*        \*        \*        \*        \*        \*        \*

*On Re-Direct Examination.*

"Q. What was his intention with reference to the youngest child?

"A. To cut him out of any part of his estate.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Did you tell Mr. Peters when he asked you about this matter that you understand that the stock was to be held for one child only?

"A. For one child only, and that was for Geo. E. Passmore, Jr.

"Q. What did Mr. Peters say with reference to that?

"A. Why Mr. Peters said that this stock had been left and that Mr. Russell held this stock *for his children.*

"Q. And you are quite sure, are you not, so far as your knowledge goes, it was for the one child only?

"A. So far as my knowledge is, I never was told anything more than this stock was committed to Mr. Russell for the benefit of Geo. E. Passmore, Jr., to the exclusion of all the others.

"Q. Then if it is a fact, as stated by the witness Peters, at the time of his death, Mr. Passmore said that Mr. Russell had stock for the benefit of *his children,* it was a trust created in your absence and *different from the one you had been impressed with?*

"A. Yes, if there had been no change made; *no such trust had been made in my presence."*

(The italics above are supplied, indicating those portions of the testimony of Mr. Osborne which tend to make a different case from that alleged in the bill.)

Mr. Pettus, a witness for the plaintiffs, testified in substance that from talks with witness of both Mr. Geo. E. Passmore and Mr. Russell at different times, but probably at no time when both were together at the same time, the impression was created on the mind of the witness by both

of these gentlemen that on September 8, 1910 (when a stock certificate No. 126 for said fifty shares of bank stock was assigned by Passmore to Russell by endorsement on the back of the certificate), that the stock was placed with Russell in trust for the boy, Geo. E. Passmore, Jr.; that the reason this was done was that Passmore "was having a little domestic trouble at the time which upset him considerable;" that the trust was to continue "pending domestic adjustment;" that it was "a temporary arrangement between these two gentlemen, whereby Mr. Russell was to hold the stock for Mr. Passmore;" that he did not know "whether the domestic conditions improved any between September 8 and November 23, 1910," when the stock was transferred on the books of the bank to the name of Passmore, and stock certificate No. 136 was issued to the latter therefor as the owner.

This witness further testifies that "inasmuch as the transfer" (on the books of the bank) "was not made to Mr. Russell" (at the time of the assignment of the stock aforesaid), "but was made several months later," (on November 23, as aforesaid), witness "was under the impression that at that time Mr. Russell bought the stock;" and that, while witness could not say positively, if there was no mistake in his mind, "Mr. Russell said something about having bought the stock," and that was the impression left on the mind of the witness as of November 23, 1910. (So much of this testimony as referred to the statement of Mr. Russell about having bought the stock was objected to.)

Mr. Peters, above mentioned, also a witness for plaintiffs, testified that said donor, Mr. Passmore, on the day of his death, after being advised by his physician that his life could last only a few hours, sent for witness, and had an interview with witness in which he made certain statements to and gave certain instructions to witness, of which the witness made a memorandum in writing at the time. This memorandum is as follows:

*Memorandum.*

"Pay notes in bank and collect others-bal—children.

"Pay mill notes.

"Get watch in Rich'd—Edward.

"Fifty shares stock G. B. R.—*children.*

"W. H. Int. W. E. H.—children.

"Furniture, pistol, etc.

"For children—when of age.

"See that Mrs. P. gets none of it.   Don't want boy to have anything.   Don't let W. C. W. have anything to do with what I have."   (Italics supplied.)

In explanation of this memorandum this witness testifies as follows:

"The first note of the memorandum is: pay notes in the bank, the notes which he had reference to were held by me, and collect other notes which were held by me for collection; get watch in Richmond; he had a watch in Richmond that he gave it to his son Edward; fifty shares of bank stock, with the initials 'G. B. R.,' *for his children;* Warehouse interest W. E. H., then he mentioned his furniture and a pistol, which were all left to his children when of age; now there is a further memorandum; see that Mrs. P., means Mrs. Passmore, gets none of it, meaning none of his property; don't want boy to have anything, meaning his youngest child; don't let W. C. W. have anything to do with anything I have.

"Q.  Who was W. C. W.?

"A.  Mr. W. C. Winn.

"Q.  Was W. C. Winn his father-in-law?

"A.  Yes, sir.

*     *     *     *     *     *     *     *

"Q.  To whom does G. B. R. refer to on this memorandum?

"A.  Geo. B. Russell.

*     *     *     *     *     *     *     *

(The admissibility of this testimony as evidence in the case is drawn in question by the assignments of error, and is one of the subjects dealt with in the opinion below.)

The following further testimony of this witness will be noted:

"Q. Mr. Peters, I will ask you if you know of anything, or if anything has come to your knowledge, or under your observation, which would justify you in saying that this fifty shares of bank stock, placed in trust with Mr. Geo. B. Russell in 1910, was disposed of or settled between Mr. Russell and Mr. Passmore, prior to the death of Mr. Passmore?

\*    \*    \*    \*    \*    \*    \*    \*

"A. I have no knowledge of any such settlement.

"Q. Mr. Peters, I will ask you if, after you qualified as one of the administrators of the estate of Mr. Passmore, whether Mr. Russell made any remittances to you on account of this trust, and if so, what remittances were made, and when, and at whose request or suggestion?

\*    \*    \*    \*    \*    \*    \*    \*

"A. Well, during the time I was administrator, sometime subsequent to the closing of my joint administratorship, I appealed to Mr. Russell by letter for funds to complete the payment to the Blackstone Female School of the tuition of Marion Passmore, and on three separate occasions, as I remember, I received from him one hundred dollars ($100.-00)," (making $300.00).

\*    \*    \*    \*    \*

This witness further testifies in substance that his understanding of the wishes of the said donor was that no record should be made by any one of any of the transactions growing out of said trust. That it was a secret trust and was intended to be kept strictly so from all except the donor, the trustee and the two persons, Osborne and the witness, who had respectively the information concerning it which

appears in evidence. That witness kept no record of the dates of the remittances from Russell aforesaid. That his letters to Russell asking for such remittances contained the request that they be returned to the writer with the remittances so that they might be destroyed. That the letters were so returned and were destroyed at the time. That witness had the money placed to the credit of the guardian in bank. That the only information given the guardian was that this money came from a gift through the bank.

There are the following circumstances appearing from the testimony of this witness which need to be mentioned as throwing some material side light on the trust involved in this suit: It seems that in September, 1910, the same donor aforesaid, Passmore, placed in the hands of this witness, Peters, for collection, a number of choses in action belonging to such donor, consisting largely of notes of various debtors of the latter, with the declaration or direction, "that those collected before his" (the donor's) "death were to be paid to him and those collected subsequent to his death to be used *for his children.*" (Italics supplied.) That the witness made certain of such collections and paid over same to the donor in the lifetime of the latter, but at his death had an uncollected balance of such assets in hand, amounting to "something like twelve or fourteen hundred dollars." He further testifies as to this:

"Q. That was in your hands at the time of his (the donor Passmore's) death?

"A. Yes, sir.

"Q. Was that for the benefit of all of the children?

"A. It was for the benefit of his children as stated in that memorandum"—referring to the memorandum above copied.

And at another place this witness testifies that the assets of which he was the trustee, as aforesaid, were held by him "under the same terms as that I understood that this stock"

(the fifty shares of bank stock aforesaid) "was placed with Mr. Russell."

And this witness testifies, and adheres to his testimony on the point, after a searching cross-examination, that notwithstanding his testimony above noted in explanation of the memorandum aforesaid, to the effect that the said donor then stated that the youngest child of the donor was not to "have anything," this was not understood by the witness to mean that such child was not to share in the bank stock trust in the hands of Russell, nor that such child was not to share in the notes trust in the hands of the witness; but that the objects of both trusts alike, as the trusts existed at the death of the donor, Passmore, were *all of the children* of such donor. That this was true of the notes trust in the hands of the witness as it was originally created in September, 1910. That while this might not have been true of the bank stock trust in the hands of Russell as it was originally created, it had become true of it prior to the death of the said donor, as evidenced by his death-bed statement, aforesaid, to the witness.

And the action of the witness was in accordance with his interpretation of the meaning of the memorandum as not excluding the youngest son, aforesaid, from sharing with the other children of the donor as an object of the bank stock, as well as of the notes trust. For this witness testifies that he from time to time placed in bank to the credit of the guardian sums arising from the latter trust, as gifts from the bank, leaving it to the guardian to distribute and disburse the money for the benefit of all of the children. That the very same thing was done by the witness with the remittances made to him from Russell as aforesaid. And that the guardian divided these remittances between the children as he saw fit, not excluding the youngest child aforesaid, from his share thereof, and that this was what witness expected the guardian to do, and was in accordance

with the terms of both of said trusts as the witness understood them.

Mr. Smithson, another witness for plaintiffs, a warehouse man and auctioneer in the employment of the said trustee, Russell, testifies that about six weeks before the latter went to the hospital on the occasion of his last illness preceding his death, the witness was in Russell's office, and "there was something said about the Passmore children." That he (Russell) asked witness "how they were getting along, and remarked to" (witness) "that he had some money belonging to the Passmore children, and at that time some one came into the office and the subject dropped and" (witness) "did not hear anything more about it."

(Smithson's testimony was also objected to by the defendants as inadmissible in evidence, and this point also is dealt with in the opinion below.)

It appears in evidence that the said donor, Passmore, the said trustee, Russell, and the said Osborne and Peters were and are men 'of the highest character and of the strictest integrity.

It further appears in evidence that while the said trustee, Russell, kept a full set of books of his affairs, including a guardianship account, nowhere on his books was any entry made of the trust asserted in this suit. That shortly before his death and when he was advised that he had not long to live, Russell went carefully over his books with his bookkeeper, but made no mention of the aforesaid trust to his bookkeeper, nor left any memorandum of it among his papers, and made no provision therefor in his will, unless the provision therein which directed that "all my just debts * * * be paid as promptly as practicable," was intended to cover such trust indebtedness. That in financial statements of his assets made by Russell in 1911, 1912, 1913 and 1915 he included the bank stock aforesaid among his individual assets. That in 1914, 1915, 1916 and 1917 he

pledged that identical stock (certificate No. 136) as collateral security for his individual notes in bank to the amount of $2000.00 for the most of the time, which was reduced to $1,000 in 1916, and paid off in 1917. That Russell was amply financially able to have paid said donor for said stock at any time between September 8, 1910, and the donor's death, and to have made such payment thereafter at any time prior to his own death to any one entitled thereto. That in the opinion of a number of reputable witnesses intimate with Russell it was not consistent with his business habits and character that he should have held the bank stock aforesaid in trust without making any record or disposition of it prior to or at the time of his death, indicating that it did not belong to him.

The decree under review, besides overruling the demurrer as aforesaid, holds that the said Geo. B. Russell held the bank stock aforesaid upon a secret trust for the benefit of all of the children of the said donor, Geo. E. Passmore, deceased; that the dividends on such stock collected by Russell and his executors amounted to $2,525; decreed that the plaintiffs recover of the defendants "for the equal benefit of all of the children of Geo. E. Passmore, deceased, the said fifty shares of * * stock * * together with all dividends thereon * * as above set forth, with interest on said dividends from the respective dates of payment, subject to the * * credit of $300.00" (the amount paid by Russell in his lifetime through the hands of Peters to the guardian of said children) "and a commission of five per cent. on said dividends is * * * allowed the estate of Geo. B. Russell, deceased, as a further credit upon the debt aforesaid."

*Watkins & Woody* and *Henley, Hall, Hall & Peachy,* for the appellants.

*George E. Allen* and *W. R. Jones,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The following questions presented for our decision by the assignments of error and cross-error will be disposed of in their order as stated below.

1. Are the facts set out in the bill, and is the evidence in the cause, sufficiently unequivocal, explicit, clear and convincing to establish the parol trust alleged in the bill, which was for the exclusive benefit of George E. Passmore, Jr.; and if so was the interest vested in the latter under that trust as originally created irrevocable by the donor after the creation of the trust?

[1]    The standard of proof required by the authorities to establish a parol trust of personality, as said in 3 Pomeroy's Eq. Jur. (3d ed.), sec. 1008, "demands clear and unequivocal evidence"—citing a great number of cases. The standard is certainly no higher than that applicable to parol trusts of real estate. As to the latter, the rule is that the declaration of the trust must be unequivocal and explicit and established by clear and convincing testimony. *Fleenor* v. *Hensley*, 121 Va. 367, 93 S. E. 582; *Taylor* v. *Delaney*, 118 Va. 203, 86 S. E. 831.

[2]    We have no hesitancy in holding that on demurrer thereto the facts set out in the bill are sufficient to establish that the trust as alleged in the bill was created and accepted by the trustee, Russell, as therein alleged. And the same is true of the evidence in the cause, as appears from the statement preceding this opinion.

[3]    Answering the second branch of the question under consideration, we must also hold that the interest vested in George E. Passmore, Jr., under the trust as originally created, which is alleged in the bill, was irrevocable; but that such trust as disclosed by the evidence was not irrevocable; that the latter was on the contrary, revocable by the

donor at any time after the creation of such trust up until his death.

[4]    The latter conclusion necessarily results from the character of the trust now under consideration, as it appears from the evidence.   The gift of the beneficial ownership of the bank stock to the eldest child, George E. Passmore, was not a complete unconditional gift *inter vivos*, as would have been the case if the facts had been as alleged in the bill.   The proof discloses that this was a gift conditioned by necessary implication upon its remaining unrevoked at the death of the donor, so that, under well settled principles, by the terms of the declaration of trust, the beneficiary, George E. Passmore, Jr., took indeed a vested equitable interest thereunder, but subject to be divested by revocation by the donor at any time thereafter previous to his death.

[5]    It is true, as said in 1 Perry on Trusts (6th ed.), sec. 104.   "A completed trust without reservation of power of revocation can only be revoked by consent of all the *cestuis*.   If a voluntary trust for the benefit, wholly or partly, of some person or persons other than the grantor, is once perfectly created, and the relation of trustee and *cestui que trust* is once established, it will be enforced, though the settlor * * has attempted to revoke it by making a second voluntary settlement of the same property, or otherwise, or if the estate, by some accident, afterwards becomes revested in the settlor.   In all these cases the first, perfectly created trust will be upheld, with all its consequences * *. A trust once created and accepted without reservation of power can only be revoked by the full consent of all parties in interest; if any of the parties are not in being, or are not *sui juris*, it cannot be revoked at all."   But, in the case before us there was not created a completed trust without reservation of power of revocation, nor was such a trust accepted by the trustee.   By the very terms of

63

the declaration of trust, the beneficial interest which was vested in the object of the trust was necessarily subject to be divested upon the happening of the event of subsequent revocation by the donor prior to his death, and hence was conditioned upon the trust in favor of such object remaining unrevoked until that time.

[6-8]    Such a gift, although by parol, is recognized by the authorities as good as a gift *causa mortis* (1 Perry on Trusts, section 87 and authorities cited), or as good as a gift by way of an express trust, and in the absence of fraud, mistake or misunderstanding, is enforceable after the death of the donor if left unrevoked at his death (1 Perry on Trusts, note (a), on p. 114; *Idem,* sec. 104, at p. 137). As said in the learned work last cited, at p. 137: "Although the power of revocation is reserved, the trust is as good and effectual as if irrevocable, until the power is exercised." See to the same effect 39 Cyc., p. 94. The last cited authority (Cyc.), at p. 92, does state that "a trust completely created and containing no *express* power of revocation, is not revocable by the creator without the consent of the beneficiary." (Italics supplied.) But on principle, and in accordance with the authorities, it is not material that the power of revocation be *express*. If it exists by necessary implication under the terms of the gift, it may be exercised just the same as if expressly reserved. This indeed is expressly held in *Sterling* v. *Wilkinson,* 83 Va. 791, 3 S. E. 533. That case, however, does go too far in the expressions in the opinion (not necessary for the decision of that case) to the effect that a gift of a subject deposited in the hands of a third person conditioned to take effect in absolute right in case of the death of the donor is testamentary in its character and cannot be enforced unless evidenced as required by the statute of wills. So broad a holding, as applicable to a gift where the subject of it is as of the time of the gift (the creation of the trust), deposited into the

custody or possession of a third person as trustee, the trust
having been perfectly created by action which includes the
acceptance of the trust by the trustee in the lifetime of the
donor, is not in accord with the authorities on the subject,
as we have above seen, nor is it correct on principle, and
to that extent the case just cited is hereby disapproved. In
the case of *Basket* v. *Hassell,* 107 U. S. 602, 2 Sup. Ct. 415,
27 L. Ed. 500, which is made the basis of that part of the
opinion of the court in *Sterling* v. *Wilkinson, supra,* which
is above disapproved, the deposit of the subject of the gift
was not made at the time of the gift, so as to create a com-
plete equitable assignment or transfer of the subject. What
is said by the Supreme Court in its opinion must be read
with this fact in view. That opinion itself refers with ap-
proval to the holding in *Bromley* v. *Bruton,* L. R. 6 Eq. 275,
to the effect that "if a banker accepts the check, or other-
wise subjects himself to liability as a trustee, prior to the
death of the donor, the gift is complete and valid;" and in
substance holds that any action of a donor which makes a
complete equitable assignment in his lifetime creates a valid
gift of the subject of the assignment as between the donor
and donee.

[9]    A valid equitable assignment, may, of course, be con-
ditional. And if the condition be a subsequent condition,
although it has power to divest the equitable title to the
gift, yet if that condition does not arise, the title, by rela-
tion, is regarded as complete and absolute from the time
of the gift. And when such condition involves a possible
revocation of the gift by the donor in his lifetime, on his
death without having exercised such power, upon the same
principle as that which is involved in gifts *causa mortis*
(*Basket* v. *Hassell, supra*), the equitable title does not await
until after the death of the donor to pass to the beneficiary,
so as to become a testamentary disposition, but is regarded
as having passed in the lifetime of the donor at the time of

the gift—where the gift is in proper form to be effectual, as, of course, is unquestionably true where possession of the subject of the gift is given by the donor to a trustee who accepts the trust, all in the lifetime of the donor.

In *Sterling* v. *Wilkinson,* indeed, the donor revoked the gift in his lifetime in favor of certain creditors of his, and that fact was all that was needed to support the decision of the court that the gift was invalid *pro tanto.* And besides, as is elementary law, all gifts are invalid as against existing creditors of the donor, and will be set aside at their suit; and the court in the case just cited also held that, "whether the deposit with Wilkinson in 1876 was intended to take effect before Irick's" (the donor's) "death or not, which is not clear, this gift to his children was voluntary and cannot be upheld against his creditors."

[10-11] Now it is, of course, well understood that a gift *causa mortis* may be revoked by the donor after it is made at any time before his death, and it will also be revoked by operation of law if the donor recover from the particular illness or peril which existed at the time the gift was made and was the cause of the gift, or if there occurs a deficiency of assets necessary to pay the debts of the deceased donor. *Basket* v. *Hassell, supra;* 8 Am. & Eng. Ency. Law (1st ed.), p. 1351. See also other authorities cited in *Shankle* v. *Spahr,* 121 Va. at pp. 607-8, 93 S. E. 605; 2 Story's Eq. Jur. (14th ed.) section 813, 815, 821. However, the proof in the cause before us does not disclose the existence of the peril or the illness of the donor at the time of the gift requisite to enable the plaintiffs or the said eldest one of them to rely on the gift in question being good as a gift *causa mortis.* But in any case, as we have just seen, the initial gift of the bank stock made on September 8, 1910, as disclosed by the evidence, as set forth in the statement preceding this opinion, must be regarded as having been a gift which was revocable by the donor at any time thereafter in his lifetime.

[12, 13] 2.   Is the parol declaration of the donor made on his death bed, as per the testimony of the witness, Peters, set out in the statement preceding this opinion, to the effect that (a) up to that time the character of a trust, previously imposed upon the gift of the bank stock which was placed by the donor in the hands of the trustee, Russell, had not been changed; but that (b) the donor had partially re-voked the gift as first made to his oldest son exclusively, by subsequently (between September 8, 1910, and the time of the deathbed utterance in question), having in some way, the precise method being undisclosed by the evidence, directed the trustee to hold the bank stock for the benefit of all of his children, admissible?

We are of opinion that the evidence in question is admissible on the subject (a) stated, as forming a part of the *res gestae.*   10 R. C. L., pp. 974-980; *Keister's Ex'rs* v. *Philips' Ex'x,* 124 Va. 585, 98 S. E. 674.   The main fact here involved is whether a trust relationship, unquestionably previously established, did or did not at a given subsequent time continue to exist.   On that subject the *bona fide* conduct and accompanying declaration of one of the parties to that relationship are themselves facts which have a legitimate bearing, and are admissible in evidence.   The proper weight to be given to it is another matter and depends, of course, upon all the other facts and circumstances of the case.

We are also of opinion that in this case the evidence in question was also admissible as against Russell's estate on the subject (b) stated.   If the character of a trust, previously unquestionably imposed on the gift of the bank stock in the hands of Russell, continued, whether the object or objects of the trust had been changed or even whether they had been so ineffectually declared as to be wholly unascertainable, so that the trust had become incapable of taking effect, were matters which in no way

affected Russell or his estate.   Even in any such case Russell could not, nor can his executors hold the subject of the trust.   It would pass to those who would take under the disposition of the law.   *Sims* v. *Sims*, 94 Va. 580, 27 S. E. 436, 64 Am. St. Rep. 772; *Fitzsimmons* v. *Harmon*, 108 Me. 456, 81 Atl. 667, 37 L. R. A. (N. S.) 400; Lewin on Trusts (1 Am. Ed.) top p. 1489.

[14] 3. Is the evidence in the cause sufficiently unequivocal, explicit, clear and convincing to establish that, after September 8, 1910, and prior to the death of the donor, the trust of the bank stock as originally created on the former date had been partially revoked by the donor and a different and enlarged trust, as to its objects, had been created by the donor by direction to the trustee to hold the subject of the trust for the benefit of all of the children of the donor, and that the trustee had, during such period, accepted such trust?

[15-18] We are of opinion that this question must be answered in the affirmative.

We have in evidence the admission to this effect of Russell, as shown by the testimony of Smithson, set forth in the statement preceding this opinion, when that admission is considered in connection with the conduct of Russell in making the remittances after the donor's death for the benefit of a daughter of the donor.   Conduct is in its nature a convincing character of proof.   While the mere testimony of Smithson giving his recollection of a statement made by Russell, who was dead at the time Smithson testified, although admissible as evidence, must be received with great caution (39 Cyc. 84-5; *Garrett* v. *Rutherford*, 108 Va. 478, 62 S. E. 389), and would have but little convincing force merely of itself; yet when that testimony is corroborated by the conduct of Russell in his lifetime in making remittances of substantial sums of money on three separate occasions, under circumstances which cannot be reasonably

explained upon any other theory than that Russell then recognized the continued existence of the original trust of the bank stock accepted by him, with a change and enlargement of the objects of the trust, and as further corroborated by the deathbed declaration of the donor aforesaid, the cumulative evidence becomes unequivocal and clear and very convincing.

[19] It is urged in argument for the defendants, with much force and ability, that the evidence in the cause showing the character of Russell for integrity, his pledging of the bank stock as collateral for personal obligations, his inclusion of it in the financial statements made by him of his assets, his failure to make any record of the trust, the fact that he did not leave at his death any memorandum on the certificate of the stock or among his papers or on his books, when he knew some six months before his death that his end was near, furnish convincing evidence that he left no unsatisfied trust existing at his death; although the trust as alleged in the bill may have been originally created and accepted by Russell as therein alleged. And what is said by Mr. Justice Story, in the opinion of the Supreme Court in *Prevost* v. *Gratz,* 6 Wheat. 481, 5 L. Ed. 311, as to the presumption of fair dealing which will be drawn after a lapse of time and the loss of evidence by the death of parties, is urged upon our consideration. It is there justly said that, "Fraud or breach of trust ought not lightly to be imputed to the living; for the legal presumption is the other way; and as to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes and violate the sanctity of the grave, unless the evidence of fraud be clear beyond a reasonable doubt." And again: "If after the lapse of forty years and the death of all the original parties, we were to come to a different conclusion, it would be pressing doubtful circumstances with uncommon rigour against unblemished char-

acter; where the confidence reposed was so intimate, that
the whole evidence could not be presumed to be before us.
We would indulge in opinions which might be erroneous
and might, in an attempt to redeem the plaintiff from con-
jectural fraud, inflict upon others a most gross injustice.
We think, therefore, that the true and safe course is to abide
the rule of law which, after a lapse of time, will presume
payment of a debt, surrender of a deed, and extinguishment
of a trust, where circumstances may reasonably justify it."
The cogency and justice of this deliverance is irrefutable.
It is because of the considerations thus suggested that while
the statute of frauds and the statute of limitations will not
bar a suit in equity to enforce an express continuing trust,
although dependent upon parol evidence for its establish-
ment; yet prescription, or laches in the assertion of it, or
lack of sufficient evidence of an unequivocal and convincing
character to clearly and satisfactorily establish the trust
will operate to defeat its enforcement.   These considera-
tions have been all borne in mind by us in weighing the evi-
dence in the cause before us.   And it is a very different case
from that last mentioned.   In the case before us we have
not alone parol evidence of the admission of the trustee
shortly before his death that the trust continued to exist in
the changed and enlarged form, as aforesaid, but conduct
of the trustee in making remittances every time he was
called upon prior to his death, which we feel cannot be rea-
sonably accounted for except the hypothesis that they were
made on account of and in recognition of the existence and
of the continuance of the trust in such changed and enlarg-
ed form.   And we have the existence of the pregnant fact
that Russell never mentioned to Osborne or to Peters that
the trust no longer existed.   It is not a case involving any
breach of trust on Russell's part.   The evidence to our
minds is clear and convincing that he never in his lifetime
repudiated the trust.   While under ordinary circumstances

his failure to make any record, or leave at his death any memorandum, etc., as above mentioned, in view of Russell's business habits and high character, would carry great weight as evidence that the trust had terminated before his death, such considerations are, under the peculiar facts of this case, stripped of most, if not all of their evidential value in such direction. The very reason for the trust demanded the utmost secrecy consistent with the knowledge of it by the donor and donee, and by those to whom the donor confined its existence. Before his death the trustee knew that he was leaving behind him at least one living witness, Peters, who knew of the existence of the trust; and also, as Osborne had been present and took part in the original creation of the trust, it was natural for Russell to suppose that Osborne would supply another witness to establish it after his, the trustee's death. The conduct of the trustee under consideration, so far from being inconsistent with the continued existence of the trust, was wholly in accord therewith. And touching the pledging of the bank stock and the inclusion of it in the financial statements of the trustee as his individual property, the following circumstances render that conduct, to our minds, entirely consistent with his integrity and with his recognition of the continued existence of the trust. As appears from the statement of the facts preceding this opinion, the subject of the trust as first created was in fact money. The elaborate and specific action of, first, the delivery of the money by the donor to the trustee through the hands of the witness, Osborne, secondly, the purchase by the trustee of the donor of the bank stock by the use of this same money, could not have been intended by experienced, practical business men, as these were, to have been meaningless. In truth, what was done evidenced that the subject of the trust was indeed money. The transaction created a debt of the trustee, a debt fiduciary in its character, a trust debt, but nevertheless

64

a debt, the primary obligation of which upon the trustee was that he should hold in trust and eventually pay out money. The real obligation might therefore most naturally have been regarded as a money obligation, as a holding in trust of the money—as Russell in fact regarded it, according to Smithson's testimony. And this too may well account for Pettus' testimony, even if admissible as evidence (which it is unnecessary for us to decide upon), to the effect that if he was not mistaken "Russell said something to him about having bought the stock." In Osborne's mind, the investment of the money in the bank stock made the greater impression so that he naturally attaches to that transaction, the terms of the trust, which were primarily, according to his own testimony, attached also to the gift of the money. That is immaterial, however, since under well settled rules of equity the beneficiaries in such case have the option to hold the trustee or his estate liable for the money with interest, or the property in which it was invested, with all actual profits, where the rights of no third person intervene. I Lewin on Trusts, top p. 340; 2 Perry on Trusts, section 835. That is to say, equity, in such case, at the option of the beneficiaries, will impress upon such investment the same trust as originally adhered to the money which was used to make the investment. But this does not at all affect the fact that Russell doubtless regarded the transaction as a money obligation and the investment in the stock as but an investment subject to change at his will, since he was solvent and his estate amply sufficient to satisfy the trust. Hence, it is plain that Russell regarded the bank stock as his own and dealt with it accordingly. And doubtless also he regarded the provision in his will for the payment of his just debts—which indeed the law would have made in any case—as all that was necessary to hold his estate responsible for the trust debt.

[20] The only subject which could be said to be left open

to any reasonable doubt is that of whether the youngest son of the donor was by the second declaration of trust excluded from the benefit of it.    The testimony on this subject is outlined in the statement preceding this opinion.    And it must be frankly admitted that if the case rested alone on the testimony of the witnesses bearing on what were the precise terms of the second declaration of trust, this subject would be left in doubt.    But here again we have in evidence the conduct of three actors in the matter—that of the donor on his deathbed including the subject of this trust among other assets about which he then made certain evidentiary declarations of trust and of gift, embracing the declaration that the subject of this particular trust was held "for his children" by Russell, with no limitation appended to that specific item, and with Peters' testimony in explanation of what the donor did later on in the deathbed statement say as to not wanting the boy "to have anything;" that of Peters subsequently, who, the evidence leaves no room to doubt, was actuated at the time by the sole motive of faithfully putting into effect the terms of the trust as it existed at the time of the death of the donor as then evidenced by the deathbed statement of the latter, and that conduct evidenced that the youngest son of the donor was not excluded, but was included as one of the objects of the trust by the terms of it as it existed at the time of the death of the donor as then declared by the latter—and we have the conduct of Russell, the trustee, aforesaid, which, in effect, also evidenced such existence of the same trust.    The cumulative effect of such evidence is very convincing; and we are of opinion that the evidence on the subject, when all of it is considered, measures up to the standard of the character of proof required in such cases stated in a preceding part of this opinion, and establishes the fact that the trust, as it existed at the death of the donor, was for the benefit of all of his children.

[21] 4.    But if it were conceded that the evidence left

it in such doubt as to render the fact unascertainable from the evidence whether the youngest son is included among the objects of the trust, would the trust be, for that reason, incapable of enforcement?

[22] The certainty as to the designated objects of a trust which the law requires to make the trust enforceable in a court of equity, as contemplated in the authorities, notwithstanding what is said in those cited for defendants on this subject—(39 Cyc. 34-5, 58, 59, 60, 70-2, 80; 2 Pomeroy's Eq. Jur. (3d ed.), sections 997-98, 1009 and notes; *Doan* v. *Ascension Parish,* 103 Md. 662, 64 Atl. 314, 7 L. R. A. (N. S.) 1119, 115 Am. St. Rep. 379; Hill on Trustees (3d ed.), star pp. 44, 59)—is not certainty as to *all* of the objects or beneficiaries of the trust.

As held in *Hill's Ex'rs* v. *Bowman,* 7 Leigh (34 Va.) 650, at p. 657, of a trust created by a will, per opinion delivered by Judge Tucker: "No authority in point has been produced to show that a declaration of trust, in favor of certain definite objects of the testator's bounty, is avoided because in the same clause there is a limitation to persons not certain and ascertainable. Reason and authority, on the other hand, conspire to say, that so far as the testator's will is legal, intelligible and certain, it shall be effectuated, and what is illegal, insensible and uncertain shall be rejected." Accordingly, the court in that case held the trust good as to the designated beneficiaries of the trust, although the trust was held to be void with respect to certain beneficiaries not designated with sufficient certainty to identify them. This holding is equally applicable to other express trusts, such as that involved in the cause before us.

[23] 5. Is the statute of frauds (Code 1887, section 2840, sub-section 7; Code 1919, section 5561) applicable to an express parol trust, such as that involved in this cause, the duties of which are not to be completely performed within a year?

It is well settled that the statute of frauds is not applicable to an express trust in personalty, although created by parol. *Riggan's Adm'r* v. *Riggan,* 93 Va. 78, 24 S. E. 920; 1 Perry on Trusts (6th ed.) section 86; 1 Lewin on Trusts (1st Am. ed.)., top p. 54; 3 Pomeroy's Eq. Jur. (3d ed.) section 1008; *Berry* v. *Berry's Ex'r,* 119 Va. 9, 89 S. E. 242. It was at one time open to contention in this State that the statute of frauds was applicable to an express parol trust in realty; but it has been for some time settled with us that such statute is not applicable even to express parol trusts in realty. *Young* v. *Holland,* 117 Va. 433, 84 S. E. 6, 637; *Fleenor* v. *Hensley,* 121 Va. 367, 93 S. E. 582.

As said in Perry on Trusts, *supra* (section 86): "Personal chattels are not within the terms of the statute" (of frauds) "and trusts in personal property may be declared and proved by parol. * * * It has been so ruled in express decisions in the United States"—citing a great number of authorities. To the same effect is Lewin on Trusts, *supra* (top p. 54), and 3 Pomeroy's Eq. Jur, *supra* (section 1008). The principle on which this doctrine rests is, as is especially developed in the American authorities, not upon the determination of whether the duties imposed on the trustee are or are not to be performed within a year; but upon the consideration that to apply the statute in favor of a trustee who has obtained the custody of the subject of a trust upon the faith of his promise, express or implied, to perform the duties of the trust, would facilitate rather than prevent fraud; "that the statute is intended to prevent not to facilitate fraud;" and that, "the rule in equity always has been that the statute is not allowed as a protection of fraud, or as a means of seducing the unwary into false confidence, whereby their intentions are thwarted or their interests are betrayed." See American note to Lewin on Trusts, *supra* (bottom p. 66). The same principle permits the showing by parol evidence, notwithstanding the statute

of wills, that what is on the face of a will an absolute devise or bequest is in truth a trust, where the provisions of the will in that form were induced by the confidence reposed by the testator in the nominal beneficiary, in reliance upon the promise of the latter that he would execute the trust. *Sims* v. *Sims*, 94 Va., at p. 583, 27 S. E. 436, 64 Am. St. Rep. 772; 1 Lewin on Trusts, top pp. 64-5. On the same principle too, courts of equity enforce parol contracts for the sale of real estate, notwithstanding they fall within the express terms of the statute of frauds, where there has been such part performance that not to do so would in effect operate to sanction rather than to prevent fraud.

We need not here go into the differences between the English statute and our statute of frauds, as they are immaterial to the case we have in hand.

[24] 6. Is the statute of limitations applicable to a continuing express parol trust, such as that involved in this cause, of which there has been no unequivocal denial or repudiation by the trustee?

This question must be answered in the negative.

It is true that the statute of limitations is applicable in favor of the trustee to certain trusts other than express trusts. *Supervisors* v. *Vaughan*, 117 Va. 146, 83 S. E. 1056; *Berry* v. *Berry's Ex'r*, 119 Va. 9, 89 S. E. 242. But as to express trusts, which have not terminated, the rule is different.

As said in Wood on Limitation of Actions, section 200, p. 418: "It is well settled that a subsisting, recognized and acknowledged trust, as between the trustee and *cestui que trust*, is not within the operation of the statute of limitations." See also, *Idem*, section 201, where trusts in personal property created by parol are classed as trusts falling within the rule just quoted, if they are subsisting, recognized and acknowledged trusts.

In the same learned work, in section 212, it is said:

"* * * So long as the trust subsists, the right of the *cestui que trust* will not be barred by the possession of the trustee, however long continued, as the possession of the trustee is treated as the possession of the *cestui que trust*, and although he does not execute the trust, his mere possession and inactivity as to the trust, of themselves, afford no indicia of an adverse claim by him. But if the trustee denies the trust, and assumes absolute ownership of the trust property, in such a manner that the *cestui que trust* has actual or constructive notice of the repudiation of the trust by the trustee, the statute attaches and begins to run from that time against the *cestui que trust*, unless the latter is at the time under some one of the statutory disabilities, or is under undue influence proceeding from the trustee. Such denial of the trust, and assertion of an adversary claim in himself, is an abandonment of the fiduciary character in which he has stood to the property, and from that time the claim of the *cestui que trust* is subject to the operation of the statute. But in order to put the statute in motion, it must appear that the *cestui que trust* had, or ought to have had, knowledge of the trustee's denial, repudiation, or adverse claim, and that the trustee has been guilty of no fraud in that regard." To the same effect, see 2 Perry on Trusts (6th ed.), section 863; *Hammond* v. *Ridley's Ex'r*, 116 Va. 393, at p. 399, 82 S. E. 102; *Bargamin* v. *Clarke*, 61 Va. (20 Gratt.) 544; Hogg's Eq. Principles, section 567.

[25, 26] 7. Can the plaintiffs maintain this suit, or can it be maintained only by a substituted trustee appointed by court in the place and stead of Russell?

The first branch of this question must be answered in the affirmative and the latter branch in the negative.

This is not an action at law; but a suit in equity, in which forum the parties beneficially entitled are the proper parties to be before the court. The appointment of a substituted

trustee in the place and stead of the deceased trustee is a matter wholly foreign to the right of the plaintiffs to institute and maintain the suit.   The appointment of a substituted trustee is in every case a matter of discretion in the court, having in view the consideration of whether the circumstances render such appointment necessary or desirable. Hill on Trustees (4th Am. Ed.), p. 298.   It is a matter which does not go to the jurisdiction of the court to take cognizance of the cause, but pertains to its action in the course of its exercise of its jurisdiction.   And in the instant case, when the guardian can, under the guidance of the court if need be, exercise all of the powers which were conferred on the deceased trustee, even those involved in the discretion given him of using the fund as he "saw fit" for the benefit of the *cestui que trust* (1 Lewin on Trusts, top pp. 613-15), there is manifestly no necessity for the substitution of a trustee.

[27] 8.   Is the decree under review erroneous in that, while it establishes the same trust as that alleged in the bill, in so far as the trustee and the subject of the trust is concerned, it establishes it for the benefit of more persons as objects of the trust than are alleged in the bill?   And, if so, is that reversible error?

The first branch of this question must be answered in the affirmative; the latter in the negative.

The bill should have been amended under the statute in such case made and provided (Acts 1914, p. 641; Code 1919, section 6104), so as to make its allegations of fact conform to the proof in the cause in the particular in question, before the decree was entered.   From what we have said above, however, it is obvious that this failure to amend the pleadings did not "affect the substantial rights of the parties."   It did not affect the substantial rights of the defendants, for they have no right to hold the assets in question, regardless of whether one only or all, or indeed none

of the plaintiffs may be entitled to enforce the trust. It did not affect the substantial rights of the oldest of the plaintiffs, since the proof shows that he is entitled to recover only as a beneficiary of the trust which is established by the decree. And it did not affect the substantial rights of the other plaintiffs, since in our opinion, as above set forth, these plaintiffs are entitled to take only under a trust which is for the benefit of all of the plaintiff's.

The error was, therefore, under the statute just cited, harmless, and hence it is not reversible error. *Standard Paint Co.* v. *Vietor*, 120 Va. 595, 91 S. E. 752.

[28] 9. Is the decree under review erroneous in that it denied all allowance of commission on his receipts to the trustee or his estate, except five per cent. on his dividends collected on the stock by the trustee in his lifetime and by his executors? And is the decree erroneous in that it makes the last-named allowance?

The English rule at common law was very strict on the subject of commissions, and under it a trustee is not entitled to any compensation for his personal or professional services, in the absence of express provision for compensation in the terms of the trust. 2 Lewin on Trusts 630-1; 39 Cyc. 480. But, as laid down in the authority last cited (39 Cyc. 480), "The accepted rule in this country at the present time, however, is, in case the matter is not otherwise regulated by statute, for courts of equity to exercise just discretion, and make or withhold allowance as they consider the peculiar circumstances require." Again, the authority last quoted, at p. 483, says: "For what services allowed. * * * commissions are allowed to a trustee only as a compensation for services actually rendered in the execution of the trust * * * The mere fact that he is a trustee will not support a demand on his part for compensation * * *." And again, *Idem*, p. 487: "As a general rule commission on the principal sum coming into the hands of a

65

trustee will not be allowed; but if services are rendered for the collection of the corpus, the court has power to make an allowance out of the fund."

Such is the general doctrine on the subject under consideration, when, as in the case under consideration, there is no statutory provision for the commissions. And, without meaning to hold that such doctrine may not be modified in the sound discretion of the courts in cases of active trusts, we think that it is applicable to a trust such as that involved in the cause before us, where the execution of the trust beyond the amount actually disbursed as aforesaid has to be enforced by the court.

[29] We think, therefore, that the court below properly exercised its discretion in allowance of commissions only to the extent of five per cent. commissions on the $300 of disbursements which were actually made by the trustee in part execution of his trust; and that the decree under review is erroneous in so far as it makes any further allowance of commissions; as the residue of the trust was not executed by the trustee or his executors, nor intended to be executed by the latter.

[30] 10. Should the trustee, Russell, or his estate, have been charged with compound interest on the dividends on the bank stock received by Russell and his executors?

The plaintiffs rely on 1 Lewin on Trusts (1st Am. Ed.), pp. 277, 340, 341, 342 and 343, to sustain the position that such compound interest should have been charged.

We find nothing in this authority going beyond reference to the holdings of the court in certain cases, that compound interest will be charged against an executor or trustee where "a testator expressly directs an accumulation," or where trust moneys are used by a trustee for his own benefit in carrying on his own trade. There is no such case before us. We think there is no error in the decree in its

failure to charge compound interest against the trustee or his executors.

The decree under review will be modified so as to deny all allowance of commissions to the estate of Russell, except to the extent of five per cent. commissions on the $300 credit above mentioned, and as so modified will be affirmed.

*Affirmed.*