# Richmond.

## WAMBERSIE V. ORANGE HUMANE SOCIETY.

### FEBRUARY 2d, 1888.

CORPORATIONS—*State's control—Repeal of Charter.*—In 1769, M. bequeathed his estate in trust for the education of the poor children of Orange county. Until 1811 this trust remained unadministered. Then the legislature chartered the Orange Humane Society to administer it, which it did till 1876, when the legislature repealed the act of 1811, and transferred the fund to the Orange county school board.

HELD:

This fund had been dedicated to public uses; the said "society" was a *quasi* public corporation; over it the legislature as *parens patriæ,* had exclusive control; and the act repealing its charter was a valid act.

Appeal from decrees of circuit court of Orange county, rendered February 5th, and May 7th, 1885, in a chancery suit wherein the Orange Humane Society was complainant, and Eugene C. Wambersie and others were defendants. The said society filed its bill claiming to have been made a corporation in 1811 to administer the trust created by the will of William Monroe in 1769, bequeathing his estate to be invested and the income used to educate the poor children of Orange county. The bill also claimed that the society had, in 1830, loaned part of the trust fund on certain land as security; that the loan had never been paid except in worthless Confederate scrip, accepted in 1864 by Lewis B. Williams, then acting as secretary and treasurer of the society; that the land had, by intermediate conveyances, vested in said Wambersie, who took with knowl-

edge of the society's equities, and by collusion with Williams' executor, who was made a co-defendant. It also contended that Wambersie held the land subject to the payment of the loan, as trustee for the society; and prayed that the land be sold to satisfy the debt, and that Williams' estate be compelled to make good the deficiency, if any. All the defendants answered denying all the equities of the bill. They also demurred, submitting that the act of 1876 had repealed the charter of the society, and that the Orange county school board had succeeded to all of its corporate franchises. The circuit court overruled the demurrer and granted the society the relief prayed for in its bill. From this decree, Wambersie obtained an appeal and writ of *supersedeas*. Opinion fully states the case.

*Watson & Perkins, and S. V. Southall,* for the appellant.

*W. W. Burgess, J. G. Field, D. A. Grimsley, W. J. Robertson, Kemper & Mortin, and John G. Williams,* for the appellee.

LACY, J., delivered the opinion of the court.

The case, briefly stated, is as follows: On the 23d day of March, 1769, the will of one William Monroe, deceased, was admitted to record in the county court of Orange county, by which, after some small legacies, and a life-estate to his wife in the whole, the testator devised and bequeathed to his executors his whole estate, to be by them invested, and the annual interest applied to the education of the poor children of the said county of Orange. The widow dying soon after, the executors sold the said estate, and invested the proceeds, and, regarding the bequest for the education of the poor children of Orange as void for uncertainty, the said executors and their successors, thought themselves unauthorized to disburse the interest thereon; and after many years, no heir at law nor dis-

tributee of the said William Monroe having appeared, and regarding the funds belonging to the said estate as the rightful property of the State of Virginia, as is alleged, and in order to avoid the expenses of legal proceedings to recover possession thereof for the commonwealth, and with a view to carrying out the will of the testator in a legal way, desired and consented that the commonwealth of Virginia (to whom they believed the estate in fact belonged) should take charge of and dispose of the estate. And accordingly, on the 19th day of January, 1811, at the petition of the administrator of the said William Monroe and others, the legislature passed an act incorporating the Orange Humane Society, to consist of twelve persons, to be appointed by the county court of Orange county, to take charge of the Monroe fund, and also the proceeds of certain glebe lands in that county which had recently been sold; the same to be managed in such manner as they might deem best and most conducive to promote the object intended by the act, and to be exclusively appropriated to the poor children inhabitants of the county of Orange, only the interest to be expended in accordance with the act, and the principal not to be diminished. And by this act it was provided that the said board of twelve trustees should make annual report to the said county court; vacancies to be filled by the said court, all the justices having been summoned for that purpose; and the trustees were to hold their offices for four years, and until their successors had been appointed. This society was duly organized, and took charge of the Monroe fund, and the fund arising from the sale of the glebe lands, and administered the same to the satisfaction of all concerned for many years. In 1838, the county of Orange was divided, and the county of Green erected out of its territory. In 1839 the charter was changed, providing for the appointment of the trustees by the three counties of Orange, Green, and Albemarle. In 1851, however, by act of the legislature, the charter was again changed, and the Green Society was incor-

porated, and part of the funds assigned to that society. After some litigation, these funds were divided in the proportion directed between the two societies by a compromise agreement, and the two societies were required to report to the superintendent of the literary fund. In 1840, Lewis B. Williams was appointed secretary and treasurer of the Orange Humane Society; which position he held until his death, in 1880.

Until the breaking out of the late war, not a dollar of the funds was lost on account of imprudent investments, or otherwise, as is claimed. During the war, however, some of the funds of the society were tendered by the debtors of the same, and received in Confederate money by the treasurer, and invested in Confederate bonds; which acts were approved and ratified by the members of the board surviving, of whom there were nine living and acting trustees. But the transactions of this society not meeting with the approval of the persons claiming to be interested, and the general act of the legislature of February 21, 1872, proving ineffectual to transfer the funds in their hands, held for educational purposes, into the possession of the school board of that county, which was appointed thereby the general custodian of all funds arising from the sales of the glebe lands, and held for educational purposes, on the 27th of March, 1876, the legislature passed an act (Acts 1875-6, p. 251,) repealing the act of 1811 incorporating the Orange Humane Society, and prescribing (second section) "that the county school board of Orange county shall take possession and control of the funds, moneys, and debts, property, and assets of every description arising from the sale of the glebe lands in the county of Orange, and from all other sources, heretofore vested in and under the charge, control, and management of the Orange Humane Society"; and they were directed to use the same as prescribed in the general school law, in section 20, chapter 78, Code. The county court of Orange, however, on the 22d of March, 1880, treating this

society as still in existence, and holding the above-mentioned funds in accordance with the act of 1811, entered an order appointing twelve trustees for the society to hold and manage the said funds; September 27, 1880, substituted another trustee for one of the twelve, who had declined to act; and on March 2d, 1881, appointed one, who was substituted for another of the twelve, who had resigned. And on the first Monday in June, 1882, the Orange Humane Society, thus constituted, filed its bill against the appellee, John G. Williams, executor of Lewis B. Williams, deceased, the late treasurer of the said society, and the appellant, Eugene C. Wambersie, and others, charging that the said treasurer and secretary had collected a debt secured on the land mentioned in the bill in ante-war funds in Confederate treasury notes, and had invested the same in Confederate bonds, and thus wasting the funds of the society; and charging him as a fiduciary breaching his trust; and charging that the same having been illegally paid in Confederate treasury notes by the debtors of the society, that the said debt was a lien subsisting on the lands now held by said Wambersie by virtue of successive alienations; and praying the sale of the said land to satisfy the said debt as if it never had been paid at all. The defendant, Wambersie, demurred and answered and set up for his defense that he was a subsequent complete purchaser in good money, without notice of any claim against the land, which had long before been sold, and the debt therein fully paid, and all claims therefor duly released of record. The defendant, Williams, demurred and answered, and set up his defenses that the debt had been collected in current funds then in circulation, and duly accounted for by his testator in his lifetime to his principal, which had approved his acts, and denying all responsibility therefor. On the 3d day of February, 1885, the circuit court, by decree rendered in the cause, (reserving other questions,) directed an account to be taken of the debt in the cause mentioned, known

as the "Bramham & Jones debt," secured by deed of trust of December 27th, 1830, on the lands held by the defendant, Wambersie; and on the 7th day of May, 1885, rendered a decree overruling the demurrer, and exceptions taken to the report of the commissioner; directed that unless the defendant, Wambersie should pay the debt in question, ascertained to be $4,430 58, within five months, certain named commissioners should sell his land; and leave was reserved to the plaintiff to apply to the said court for further relief against the defendant, Williams, if the decree against Wambersie should prove unavailing. From these decrees the cause is brought here by appeal.

The first question to be considered here is as to the action of the circuit court in overruling the demurrers filed to the bill. The suit is brought by the Orange Humane Society, claiming to be an existing corporation, with a full complement of trustees, appointed by the orders of the county court of Orange above mentioned, entered in 1880 and 1881. It will be remembered that by the act of March 27, 1876, the act of 1811 incorporating the Orange Humane Society had been repealed, and the charter of the said corporation revoked, and the custody of its funds transferred to the county school board of Orange county, to be by it managed and controlled according to the provisions of the general school law of the State. If this act of the legislature is valid and binding, then the Orange Humane Society has ceased to exist, and is no longer invested with authority to sue, and the said demurrers should have been sustained. It is, however, contended that this corporation is a private corporation, and that the act of the legislature is in violation of private rights, unconstitutional, null and void. It has been said that "what a corporation really is, presents a question of fact, and not of law, and the solution of the question must be reached through the perceptions, rather than by abstract reasoning. Yet the question has given rise to a vast

amount of fruitless metaphysical discussion, both among the civil law and the common law writers."

Private corporations are associations formed by the voluntary agreement of their members, such as banking, railroad, and manufacturing companies, etc., for the preservation and advancement of private interests. Mr. Minor says (volume 1, 548), a private corporation is any one not public, and, in order that it may be public, it must not only exist for governmental or for public purposes alone, but the *whole property therein* (if there be any property) must belong to the government in its political capacity. Mr. Morawitz says (volume 1, § 5) no well-defined dividing line can be drawn by which corporations of one class can be distinguished from those of another class, and sometimes the distinctive features of different classes of corporations are joined in one and the same association. The real nature of a corporation, in every case, depends upon the charter or articles of association under which it is formed, and must be defined by reference thereto. Whether the association should be termed a public or private or religious or charitable or civil corporation is simply a question regarding the meaning of those words. Associations and government institutions possessing only a portion of the attributes which distinguish ordinary private or public corporations have sometimes been denominated "*quasi* corporations." Towns and other political divisions, school districts, boards of commissioners, overseers or trustees of the poor, etc., having authority to act and bring suit as united bodies, without regard to their membership for the time being, are *quasi* corporations of a public character. Kyd, Corp. 29; Kent, Comm. 278; *Denton* v. *Jackson*, 2 Johns., Ch. 320–5; *Jackson* v. *Hartwell*, 8 Johns., 330; *School District* v. *Wood*, 13 Mass., 193; *Carmichael* v. *Trustees of School Lands*, 3 How., Miss., 84.

In the case of *Lewis* v. *Whittle*, 77 Va., 419, this court said: "Strictly speaking, public corporations are such only as are

founded by the government for public purposes, where the whole interest belongs also to the government"; citing the opinion of Justice Story in the case of *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat., 669. Saying of the Richmond Medical College, then under consideration: "This medical college is in every sense a public corporation, made so in the manner already stated. The visitors of this college are then holding under an act of the legislature a public office or employment subject to the control and direction of the State, to be appointed and removed by competent public authority."

In the case of *School Board* v. *Stuart and Palmer*, 80 Va., 69, this court, speaking of a fund derived precisely as the fund in this case was derived from the Monroe will, said: "It was a fund peculiarly under the control of the legislature, having been dedicated to public uses, and belonging to a class of citizens under the special protection of the legislature. It was a fund which the legislature many years before had been obliged to take charge of to save it from loss. For nearly one hundred years it had been in such hands as the legislature had in its wisdom placed it. The fund in question having been dedicated by the donor to a public use, for the benefit of persons who were under the special charge of the legislature, as under an ancient act referred to above, when the vestries had ceased to be public boards, with public duties, the legislature had substituted another public board of officials to discharge the public duties formerly devolved upon the vestries; so, subsequently, the legislature substituted the last, the overseers of the poor, by the creation and designation of still another public board to discharge these public duties;" and this power of the legislature to control and to appoint and change at its will the custodians of this fund, was held to be undoubted, and the act in question sustained.

In the case of *Trustees of Schools* v. *Tatman*, 13 Ill., 30, Chief Justice Treat said, speaking of the act of legislature revoking

a grant of a ferry franchise to the school trustees: "A grant of this character may at any time be resumed by the State. It is not like the case of a grant of a franchise to an individual or a private corporation. Public corporations are but parts of the machinery employed in carrying on the affairs of the State, and they are subject to be changed, modified, or destroyed, as the exigencies of the public may demand. The State may exercise a general superintendence and control over them, and their rights and effects, so that their property is not diverted from the uses and objects for which it was given or purchased. That the trustees of schools are corporations of this character, and subject to be regulated and controlled by the legislature, is fully established by the cases of *Bradley* v. *Case*, 3 Scam., 586, and *Bush* v. *Shipman*, 4 Scam., 186. If the legislature can direct the school lands to be converted into money, and permit the debtors to the school fund to discharge their obligations in bank notes or other securities, it may certainly take away from the trustees of a township a mere franchise to keep a ferry."

The corporation in question here was created by the legislature for a specified and limited purpose—to hold and manage a fund for public uses. The Monroe trust was in abeyance. There was a dedication by the will to public uses, or to purposes in their nature public. There was no hand capable of holding and applying perpetually the interest to the ends designated by the will. The legislature in 1811 created, in its character as *parens patriæ*, a corporation, to consist of certain public officers to be appointed perpetually by public authority, and subject to public control and supervision by designated public officers. The funds under their control were for public use, and belonged to the public. By the terms of their charter, they were not only to be appointed and under the supervision of the county court, but were liable at any time to be removed by the same public authority. To this fund was

added another public fund arising from the sale of the glebe lands which was under the control of the legislature. *Selden* v. *Overseers of the Poor*, 11 Leigh, 127, and *Turpin* v. *Locket*, 6 Call, 113. This corporation was a public corporation, such as is designated a "*quasi* public corporation," was created for public purposes, and was subject in all respects to public control. Over it, indeed, the legislature, as the trustee and guardian of the public interests, has the exclusive and unrestrained control. As it did lawfully create, so it might modify or destroy it, as the public exigency required or recommended. The legislature in taking away its charter has impaired no right of this corporation, or of the members of this board, because they had no right except the right to exercise a public employment, and this right they can only exercise by authority of the law; and their authority being taken away, and confided elsewhere, their right to do any act as a corporation is gone—has ceased to exist. The act has impaired no rights of any person. The designation of another public corporation to assume the functions with which the old was clothed by law was strictly within the limits of legislative authority; and the new corporation is invested with the care and custody of the funds, which are altogether public funds, for their preservation and application to the same designated public uses, no part of this fund being the private property of any person. If this were not so, the new board can claim no rights under their appointment by the county court in 1880, after the act giving authority to the county court to appoint these trustees had been repealed. The county court was without jurisdiction to appoint them, and as a board they have no lawful existence.

It follows that the demurrer to the bill should have been sustained, and, as this reverses the case, we should properly decide only this question. As was said by the learned chief justice in the case of *Carmichael* v. *Trustees of School Lands*, *supra*, (decided in the high court of errors and appeals in Mis-

sissippi in 1838): "Although the counsel for the plaintiff requested the opinion of the court on all the points raised in the argument, we forbear giving it, as those already noticed are sufficient to reverse the judgment."

We are of opinion to reverse the decrees complained of, and will enter a decree here dismissing the bill of the plaintiff.

LEWIS, J., dissented.

DECREES REVERSED.