# Staunton

MARY CONN PENN V. IRVEN M. KELLER, SUBSTITUTED TRUS-
TEE, ETC. AND EMORY AND HENRY COLLEGE.

September 10, 1941.

Record No. 2324.

Present, All the Justices.

The opinion states the case.

*Thomas C. Phillips* and *Stuart B. Campbell,* for the appellant.

*White, Penn, Stuart & Phillips,* for the appellee, I. M. Keller.

*T. L. Hutton* and *H. E. Widener,* for the appellee, Emory & Henry College.

BROWNING, J., delivered the opinion of the court.

This case involves the disposition of a trust fund of $2,000.00 and some accrued interest. We first learn of it through the will of a man named Abram T. Litchfield, who was born in Virginia, but who was a resident of the state of Missouri at the time of the execution of the will and at the time of his death.

Clause 5 of the will comprises two paragraphs, which are as follows:

"5. I will and bequeath to my sister Mrs. John D. Cosby the sum of Two Thousand Dollars, in trust however, the interest only to be used in keeping in repair 'Litchfield Hall' on the campus of 'Martha Washington College' for young ladies, located at Abingdon, Virginia, and being the property of the Methodist Episcopal Church, South.

"If my sister should not be living at my death, then said sum of Two Thousand dollars shall be paid to the trustees, curators or other persons having the legal management and control of said Martha Washington College for young ladies, or who may be legally authorized to receive said trust fund, to be held and used for the purpose aforesaid."

The testator revoked this clause by a codicil and made Miss Emma Reed, his sister-in-law, his residuary legatee, so that the fund of $2,000.00 descended to her absolutely. Soon after Mr. Litchfield's death, which was in March, 1919, Miss Reed conceived the laudable idea of devoting a like sum, of her own, to the purpose indicated in the will, but which the testator had declined to effectuate, though it was his original notion. She paid over the sum of $2,000.00 to Mrs. John D. Cosby to be held in trust and administered in accordance with the provisions of section 5 of the will of Litchfield. Mrs. Cosby placed this money in the First National Bank of Abingdon, Virginia, which thereafter sent the interest thereon to Mrs. Cosby, who, in turn, paid it to the trustees of Martha Washington College.

Mrs. Cosby died in 1921. Her daughter, Mrs. Penn, the complainant, then acted as trustee of the fund until 1934. The latter collected the interest on the money and paid it over to the trustees of Martha Washington College until it closed.

In 1934, upon the motion of Mrs. Penn, Irven M. Keller was appointed as trustee of the fund. Mrs. Penn then borrowed a portion of these funds from the trustee, giving to him her notes therefor, secured by a deed of trust on her real property.

Keller, as trustee, paid the interest received on the trust fund to Emory and Henry College, the successor in title to the properties of Martha Washington College. Mrs. Penn told him that it was agreeable to her to so pay the interest, but not to pay out any of the principal. Mrs. Penn made no claim to the fund until shortly prior to the institution of this suit in 1938.

If Abram T. Litchfield were the creator of the trust we would be favored with the precise words which were employed, but Miss Reed occupies this relation. Her act is the genesis of the fund and it was a verbal transaction, so that we must look to what she did, and what she said in doing it, in order to determine its significance.

Litchfield Hall, referred to in the quoted clause of Mr. Litchfield's will, is located on the campus of Martha Washington College in Abingdon, Virginia. It does not appear just when it was erected, but certainly many years before the Litchfield will was made. It was named in memory of some of the Litchfield ancestors, who were Virginians and lived in Washington county, Abingdon being the county seat.

Martha Washington College was established, operated and owned by the Methodist Episcopal Church, South. It was devoted to the education of young ladies and it was successfully conducted for a long time. But the vicissitudes of fortune overtook it so that in the year of 1931, which was the beginning of the disastrous period

of the thirties, it closed its doors as an institution of learning and was unoccupied until 1937, when it was leased for a period of 25 years to the Barnhill Hotel Corporation. It has been since and is now operated as a hotel. The physical aspects of the property are about the same as they were originally. It has been much improved by being put in thorough repair and order, but the stateliness of the buildings and the beauty of the grounds are retained.

Nine miles away, in the same county, there is a coeducational institution of fine repute, named Emory and Henry College. It, likewise, is owned and operated by the Methodist Episcopal Church, South. In June, 1919, the trustees of Martha Washington College conveyed the property to Emory and Henry College, though the deed was not recorded until 1929. Emory and Henry assumed the payment of the Martha Washington College indebtedness of $168,000.00, which happily, at the time of the taking of the testimony in this case, had been reduced to about $53,000.00. At one time both institutions were managed and controlled by the same board of trustees and were closely affiliated in other respects.

We gather from the evidence that Litchfield Hall is much the same as it was. It is in the high state of preservation that is enjoyed by the rest of the plant. It is still Litchfield Hall. It is on the same campus that it occupied in 1915, the date of the Litchfield will. It is in the town of Abingdon, Virginia, and it is the property of the Methodist Episcopal Church, South. The rent derived from the lease of Martha Washington College is expended for the repair, upkeep and restoration of the property. Thus with the onus of the indebtedness lifted and the physical status of the property in shipshape its embarkation upon a future educational career will be an auspicious one if the church again elects for it such activity.

The only reason for bringing the will and its terms into the picture is that Miss Reed, the settlor of the trust,

said that she was just carrying out Mr. Litchfield's wishes, that she thought it was "a nice thing to do" and it would perpetuate the Litchfield name, and she sent the money, $2,000.00, to Virginia, she didn't remember to whom, to be used "for the benefit of 'Litchfield Hall'."

This is a portion of her examination in chief:

"Q.37. What did you intend at the time that you used the $2,000.00 to create this trust?

"A. I didn't create it.

"Q.38. Well, you sent it back—as you say, you let them have it?

"A. Just because it said so in the will. He wanted it to go to Litchfield Hall and I paid no attention to it.

"Q.39. And your sole reason for letting them have it was to carry out the intention expressed in his will?

"A. Yes."

On cross examination she testified, in part, as follows:

"Q.82. But is it not a fact that Mr. Abram Litchfield was interested in schools for young women?

"A. Not especially.

"Q.83. Don't you think he was interested in the Martha Washington College because it was a College for young women?

"A. No; just because it was in Abingdon.

"Q.84. You think it was just because it was in Abingdon?

"A. That is what I think.

"Q.85. You, personally, Miss Reed, in making this gift of $2,000.00 back in 1921—did you have in mind at all that it was being used for a school for young women for educational purposes?

"A. Yes.

"Q.86. Did it make any difference to you whether the money was used for the upkeep of a building or for general educational purposes for young women?

"A. I thought it was to perpetuate the Litchfield name."

It will be noted that Mr. Litchfield, if Clause 5 of his will had remained intact, never made Martha Washington College as such the object of his testamentary aid and solicitude. The college did not bear his name. He was doubtless urged by pride in the family name—one of those ruling passions that are even strong sometimes in death. It found expression, for the while, in a desire to preserve intact and form what he had long known as "Litchfield Hall." Where was it? "On the campus of Martha Washington College for young ladies, located at Abingdon, Virginia, and being the property of the Methodist Episcopal Church, South." He not only located "Litchfield Hall" by apt words of description but told of its ownership, another probable element evoking pride. Of course "Litchfield Hall" is a part of the college property and was used in that connection.

The above is, we think, a fair interpretation of the application of the language of the revoked clause. The language of the second paragraph does not, we think, impair or weaken this interpretation. It is strengthened by the words of one who was in a better position to speak authoritatively than anyone else. Miss Reed was, for a time, a member of Mr. Litchfield's household. She was his sister-in-law. She was his residuary legatee. She said that his interest was in "Litchfield Hall"; that he was not especially interested in schools for young women; in effect, that if he had any interest in Martha Washington College it was because it was in Abingdon and when she was asked if it made any difference to her if the money was used for the upkeep of a building or for general educational purposes for young women, she replied that she thought it was to perpetuate the Litchfield name.

Let it be borne in mind that this was the settlor's construction of the origin of her own act. She was past 90 years old when she was informed by the appellant that there was no Martha Washington College; that Emory and Henry College was claiming the money. She knew

nothing of Emory and Henry—nothing of the relations between the two institutions of learning. She lived in Kansas City, Missouri, and if she knew anything of the conditions in Virginia connected with the matters involved here the record does not disclose it. She knew of Martha Washington College and she knew of Litchfield Hall in a general way. She had years before made the provision which she thought would be "a nice thing to do", in that it would perpetuate the Litchfield name. She had settled and established this private trust and had almost forgotten about it. This latter suggestion is justified because she said that she sent the money back here and thought no more about it. She was not advised that the appellant had borrowed a part of the fund and that her residence in Abingdon was the security for its repayment. It was natural enough when the appellant wrote to her as she did and asked her for the money, which a stranger was claiming, that her generosity should again express itself in assent to the importunities. This question to Miss Reed and her answer is largely the basis of the position we are taking:

"Q.94. When you had Mr. Major send this $2,000.00 to Mrs. Cosby back in 1919, or soon after the death of Mr. Litchfield, did you ever expect to get it back at that time?

"A. No, I never thought about it. It never occurred to me. You don't need to put this down.

"Mr. Barker: Yes, put it down. That is all right.

"A. (continuing) I never thought about it one way or the other. I had forgotten all about the $2,000.00 until she told me it couldn't be used for 'Litchfield Hall' because there was no college and could she have it, and I said 'Yes', but I said 'Don't bother me about it.' "

She added that she wanted Mary Penn to have it because she needed it and had asked her for it.

This desire to help one in need—to do a kindly and generous thing—was a characteristic of Miss Reed. She signed and acknowledged two papers assigning her in-

terest in the fund to the appellant. The second paper was prepared by the appellant's attorney and sent from Virginia to Miss Reed in Missouri and it contains the opinion of the affiant that the trust had been cancelled and dissolved because Martha Washington College was no longer being operated as a college.. The wording and phraseology of this assignment bear a significance which is at hopeless odds with Miss Reed's testimony which was subsequently taken at her home in Kansas City.

But all of this is of no legal avail.

To say that there is not a lack of harmony of judicial expression and opinion on the question of the settlor's right to revoke a trust would be to withhold frankness. But we do say that, in our opinion, the better reasoned and the weight of authority is that it cannot be done without the consent of those in interest, that is, the beneficiaries, which latter term we adopt as being preferable, though equal in precision, to the old Norman phrase *cestuis que trustent*. Nowhere is this doctrine more pronounced than in Virginia.

The most recent enunciation of it is to be found in the case of *Bottimore* v. *First & Merchants Nat. Bank of Richmond,* 170 Va. 221, 226, 196 S. E. 593, where it is said, through Eggleston, J.:

"It is well settled that where a valid and effective voluntary trust has been created, and no power of revocation has been reserved, it can not be revoked by the creator without the consent of the beneficiaries thereunder. If any of the beneficiaries are not in being, or are not *sui juris,* and hence can not consent, the trust agreement can not be revoked. *Skipwith's Ex'r* v. *Cunningham,* 8 Leigh (35 Va.) 271, 31 Am. Dec. 642; *Schroeder* v. *Woodward,* 116 Va. 506, 526, 527, 82 S. E. 192; *Russell's Ex'rs* v. *Passmore,* 127 Va. 475, 497, 103 S. E. 652; 38 A. L. R. 941, note; 91 A. L. R. 103, note, citing numerous cases."

In the case of *Russell's Ex'rs* v. *Passmore,* 127 Va. 475, 497, 103 S. E. 652, the following quotation from 1

Perry on Trusts (6th ed.), sec. 104, is quoted with approval:

"It is true, as said in 1 Perry on Trusts (6th ed.), sec. 104: 'A completed trust without reservation of power of revocation can only be revoked by consent of all the *cestuis*. If a voluntary trust for the benefit, wholly or partly, of some person or persons other than the grantor, is once perfectly created, and the relation of trustee and *cestui que trust* is once established, it will be enforced, though the settlor * * * has attempted to revoke it by making a second voluntary settlement of the same property, or otherwise, or if the estate, by some accident, afterwards becomes revested in the settlor. In all these cases the first perfectly created trust will be upheld, with all its consequences * * * . A trust once created and accepted without reservation of power can only be revoked by the full consent of all parties in interest; if any of the parties are not in being, or are not *sui juris*, it cannot be revoked at all.' "

■ The eminent Dr. Wm. Minor Lile, late professor of law in the University of Virginia, in his Notes on Equity Jurisprudence, page 95, under the heading, "Control of Charities," makes this statement: "It would seem, however, that where there is a complete dedication, and hence no possibility of a resulting trust, the grantor himself, no longer having an interest in the trust, has no standing in court to have the trust enforced." *Clark* v. *Oliver*, 91 Va. 421, 22 S. E. 175; *Emory & Henry College* v. *Shoemaker College*, 92 Va. 320, 23 S. E. 765; *Wambersie* v. *Orange Humane Soc.*, 84 Va. 446, 5 S. E. 25; 6 Cyc. 968-71.

The much cited case of *Clark* v. *Oliver, supra,* involved the construction of a charitable trust and particularly with respect to the disposition and control of the fund therein. It was there said:

■ "The money was devoted to a charitable use. As we have said, the whole interest of the donors was divested. There remained in them no scintilla of right.

How then can they be heard in a court of equity with respect to the disposition of it? There is no such thing as a resulting trust with respect to a charity. Where a fund has been devoted to a charity, which, if the charity fails, will go to others, those persons having hostile interests may, of course, assert any claim they may have in the subject, and show that the charitable use has for any cause failed and become inoperative and void; but where the donor has effectually passed out of himself all interest in the fund devoted to a charity, neither he, nor those claiming under him, have any standing in a court of equity as to its disposition and control.''

In the opinion in the above case this court, through its distinguished president, Judge Keith, distinguished the Clark-Oliver case from the case of *Chambers* v. *Baptist Educational Society*, 1 B. Monroe, page 215, because both the plaintiffs and defendants in the case then under review relied upon the *Chambers* v. *Baptist Educational Society* case. It was pointed out that in the latter case in which it was sought to recover from a contributor to the trust fund the amount of his contribution and a part of the fund which was loaned to him by the trustees, he resisted their collection by asking for a dissolution of the contract of contribution in the one instance and prayed to perpetuate an injunction which he had sued out against the collection of both judgments which had been recovered against him. The distinguishing features between the two cases was that in the *Chambers* v. *Baptist Educational Society* case the plaintiff charged acts of malfeasance and abuse of the corporate powers of the corporation and the misapplication of the fund, and that he had been induced to contribute by false representations and suppression of the truth in matters material to a correct understanding of the contract of subscription. After the enumeration of these charges this court said: ''Surely that case is not in any degree analogous to the case at bar.''

The court then, in elaborating the differences between the case it was considering and the case which had been relied upon, said that while it could not concur in the view that a party, merely because he had subscribed to the found, could maintain a bill to control its disposition, still it thought the decree in the cited case "was eminently proper." Of course this perfectly natural expression was unnecessary to the decision of the case in hand, and therefore *obiter dictum*. This expression was seized upon by the appellant to justify her position that the *Clark* v. *Oliver* case, *supra*, was not controlling or persuasive in the present case; employing an ambulatory process of reasoning suggestive of the Dr. Jekyll and Mr. Hyde incident.

After the use of the expression quoted the court said:

"In our opinion, where contributors have subscribed to a fund for a charitable purpose, and have paid it over to the hand by which it is to be received and applied, their interest in and control over it cease and determine, and whatever jurisdiction is thereafter entertained by the courts with respect to the disposition and control of this fund, must be called into active exercise either by the Attorney General, acting upon behalf of the public, or by the trustees charged with its custody and administration, or by some person having a beneficial interest in the object of the trust."

In the *Clark* v. *Oliver* case, *supra,* there were no charges of ugliness of conduct nor are there any in the present case.

Nowhere have we found a more satisfactory and enlightening treatise on the subject of trusts and trustees than is contained in the American and English Ency. of Law, 2d edition, volume 28, page 848 *et seq*. At page 889, section 5, under the heading, Consideration and Voluntary Trusts, is the following statement:

"Where there is no fraud, and a trust has been actually created and the relation of trustee and *cestui que trust* established, it is irrevocable and will be enforced

in equity without regard to the question whether it is a voluntary trust or is founded on consideration; * * * ."

Idem, page 899, under the head of Revocation, is this statement: "(1) Complete Trusts Irrevocable.—If a trust has been once perfectly created with an intelligent comprehension of the nature of the act, it is irrevocable, even though it be voluntary, and the subsequent acts of the settler or the trustee cannot affect it."

■ Idem, page 949, under the heading Trust Not Terminated on Trivial Grounds.—"When a trust is clearly established a court of equity looks at the substance, and will not defeat it upon light and trivial grounds, but will accord to each party his just and lawful rights, preserving them according to the original contemplation of the parties. If the trust instrument obviously fails to conform to the intention of the settlor the court will sometimes modify it in conformity to the intention rather than set aside the trust."

Idem, page 951, under the heading No Power of Revocation.—"One who makes a deed of real or personal estate in trust without reserving the authority to alter or revoke it, and an interest in the estate passes to the beneficiaries, has no right to terminate the trust, nor to change its character, in the absence of fraud, imposition, mistake, or misapprehension, without the consent of the beneficiaries. A trust thus established is not destroyed or in any manner impaired by the subsequent conveyance, settlement, or devise of the same property, or by any other conduct on the part of the settlor inconsistent with the trust. A conveyance by the settlor's heir is equally inoperative."

Among the cases cited as authority for the above statement is *Skipwith's Ex'or* v. *Cunningham*, 8 Leigh (35 Va.) 271, 31 Am. Dec. 642.

■ It is at once seen that after the trust had been created by parol and had been paid over to the hand by which it was to be received and applied, the interest in and control over it by Miss Reed ceased and determined.

It was beyond her power to revoke it and nothing that she thereafter said or did could affect or impair its being. The fund which she donated had been impressed with the trust. She had established it of her own volition, without any mental or other reservation of any sort.

We are urged that the trust terminated because the trustees of Martha Washington College had conveyed its property to Emory and Henry College and because the grantee had leased the property for a term to a hotel corporation to be operated as was said "for commercial purposes." We do not accept this as a sound proposition, in any view of the case, but particularly in the light of the testimony of Miss Reed, the settler. She set apart the fund to be used in keeping in repair "Litchfield Hall". She said that it was to perpetuate the Litchfield name, which was in conformity with the desire of her brother-in-law, Abram T. Litchfield; that he was not especially interested in schools for young women, and that if he was interested in the Martha Washington College it was not because it was an institution of learning for young women but because it was in the town of Abingdon.

We do not think that the alienation of the school property to another school nearby, of a co-educational class, and its lease for a term to a commercial lessee, operate to terminate the trust. We are strengthened in this conclusion by the fact that the settlor was from the state of Missouri where courts of equity are clothed with the power, in upholding a trust, to employ a method of providing a subject upon which the trust is to operate, where there is at least a partial failure of the original beneficiary, which is in the nature of a substitution for the *cy pres* doctrine, which technically does not obtain in this country.

We may add that the trust we are considering had been completely created and fully and perfectly declared

at least as early as 1921 and had been in operation ever since. The fund was held by a trustee and the interest was paid and received and applied as was contemplated by the settlor, during all this time. This was with the knowledge, advice and cooperation of the appellant, who finally asked the court to appoint another trustee, so that she might borrow the money to which she now asserts ownership, and title. It is conceivable that if Emory and Henry College had not come to the rescue of Martha Washington, tottering as the latter was, under the burden of devastating indebtedness, there might not now be a "Litchfield Hall" to perpetuate the name of the gentleman who conceived the idea, at one time, of being its benefactor.

The judge of the trial court delivered a clear and convincing opinion, which was made a part of the record. To discuss it more at length would prolong this opinion, which is already too extended. We are in accord with his conclusions. The decree is affirmed.

*Affirmed.*

HOLT, J., dissenting.

Abram T. Litchfield, a churchman of Methodist Episcopal ecclesiastical affiliations, was born in Abingdon, Virginia, and lived there for quite a time. He then left this State, and, after wandering in divers places, settled in Missouri and lived in his Missouri home until his death.

In his will of date May 22, 1915, among other provisions appears this, numbered section 5:

"5. I will and bequeath to my sister Mrs. John D. Cosby the sum of Two Thousand Dollars, in trust however, the interest only to be used in keeping in repair 'Litchfield Hall' on the campus of 'Martha Washington

College' for young ladies, located at Abingdon, Virginia, and being the property of the Methodist Episcopal Church, South.

"If my sister should not be living at my death, then said sum of Two Thousand Dollars shall be paid to the trustees, curators or other persons having the legal management and control of said Martha Washington College for young ladies, or who may be legally authorized to receive said trust fund, to be held and used for the purpose aforesaid."

Said section 5 was revoked by codicil of date October 25, 1918. Mr. Litchfield himself died at his Missouri home in March, 1919.

In June, 1919, the trustees of Martha Washington College conveyed its property to Emory & Henry College but that deed was withheld from recordation until 1929. Martha Washington College, however, continued to function as an independent institution until 1931, at which time it closed its doors and, as a girls' school, was seen no more. Emory & Henry College, which held under the dead of June, 1919, recorded in 1929, leased its property to the Barnville Hotel Corporation for a term beginning in 1937 and ending in 1962, and under this lease this one-time college is now being conducted as an ordinary commercial enterprise.

So far as this record shows, neither Mr. Litchfield nor those claiming under him had actual knowledge of the deed of 1919 and no constructive knowledge until 1929, when it was recorded. And, assuming that they had constructive knowledge from that date, there was nothing to indicate a change in management or control until 1931.

When clause 5 was revoked, Mrs. Emma Reed, a sister-in-law of Mr. Litchfield, who likewise lives in Missouri, was made residuary legatee and so passed to her the $2,000 which under said clause would have gone to said Martha Washington College. Mrs. Reed, with a purpose both commendable and unusual, undertook to carry out what she believed her brother-in-law in fact desired

and to perpetuate his name, and to that end she set apart the sum which Mr. Litchfield had himself originally set apart, $2,000. This is made plain by the evidence. She was asked:

"Q. You intended by that to give effect to the provision which Mr. Litchfield had originally put in his will?

"A. Yes.

"Q. For the benefit of 'Litchfield Hall?'

"A. Yes."

With the will before her, Mrs. Reed knew exactly what Mr. Litchfield at one time intended to do. She was further asked:

"Q. And your sole reason for letting them have it was to carry out the intention expressed in his will.

"A. Yes.

"Q. And no other?

"A. That is right."

Her purpose was plain and cannot be misunderstood.

On May 14, 1920, Mrs. Reed paid over this fund to Mrs. John D. Cosby, the trustee named in clause 5 of the testator's will. Mrs. Cosby died in 1921 and control of this fund then passed to her daughter, complainant here, who is a niece of Mr. Litchfield. Her grandfather, George Victor Litchfield, was one of the founders of Martha Washington College, and his son, George Victor Litchfield, Junior, was one of its trustees.

The principal fund was deposited in the First National Bank at Abingdon, which paid over the interest thereon to complainant, who in turn paid it over to Mr. R. M. Honaker, a lawyer of standing in Abingdon who was a trustee of Martha Washington College and its treasurer. This situation continued for a period of from "eight, ten, fifteen years," and until Mr. Honaker's death. She never paid anything over to Emory & Henry College. Later on Mrs. Penn, who had acted as trustee but who had never been appointed, wished for proper purposes to borrow this fund. For reasons indicated

by her she did not think' it right to make a loan to herself, and therefore on her motion and in April, 1934, Mr. Irven M. Keller was· appointed trustee. She did borrow $355.00 and $1,145.00, evidenced by her notes and secured by a lien on her home.

Mr. Keller paid over the interest to Emory & Henry College, and it was not until then that this fund was dealt with as belonging to that institution. Up to this time, certainly, those who claim under Mrs. Reed's donation had no knowledge of the character of its claim. The balance of the trust is in the form of a claim against the bank which has failed and whose affairs are now in the process of liquidation.

Mrs. Penn is a niece of Mrs. Reed, the residuary legatee, and this residuary legatee transferred to this niece her interest in this fund. As assignee she claims to own it. To enforce that claim this suit was brought.

The lower court was of opinion that her claim was without merit.

That Mr. Litchfield intended this- bequest to be used "in keeping in repair 'Litchfield Hall' on the campus of 'Martha Washington College' for young ladies, located at Abingdon, Virginia," is too plain for argument. It is also perfectly clear that he desired that in the event that the sister predeceased him that "said sum of Two Thousand Dollars shall be paid to the trustees, curators or other persons having the legal management and control of said Martha Washington College for young ladies, or who may be legally authorized to receive said trust fund, to be held and used for the purposes aforesaid."

Here, in terms too definite to be misunderstood even by the most captious, it was to be used for the purposes aforesaid.

Litchfield Hall is a detached building on the campus of this college. On its upper floors were dormitory rooms used by girl students at this woman's college. On its lower floor is an assembly room, well suited for use by

the student body for devotional services or for purposes connected with college activities. The college has been closed; the charter has been dissolved, and its properties are now used for hotel purposes.

Now, in the lessee's advertisement, it is designated as M. W. Inn New Ball Room. In it is held the annual tobacco ball, with a floor show and other dances. It is used for commercial purposes; in it a Democratic Convention has been held; a State liquor dealers' convention might be. A more complete perversion of the purposes for which it was intended is hard to picture. The purpose of the trust has definitely failed.

In Restatement of the Law, Vol. 2 on Trusts, p. 1244, it is said:

"A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted and the beneficial interest is not otherwise effectively disposed of. Since the person who holds the property is not entitled to the beneficial interest, and since the beneficial interest is not otherwise disposed of, it springs back or results to the person who made the disposition or to his estate, and the person holding the property holds it upon a resulting trust for him or his estate."

In the recent (1939) comprehensive work of Scott on Trusts, Vol. 3, p. 2195, it is said:

"Where property is given to a trustee in trust to apply it to purposes which include charitable purposes and other purposes for which a trust cannot be created, the intended trust may fail altogether, in which case the property is held upon a resulting trust for the settlor or his estate."

In 10 American Jurisprudence, 674, it is said:

"On the other hand, where the estate is granted on condition that it shall be used for a certain charitable

purpose, the estate granted may be defeated at the option of the grantor or his heirs if the condition is not complied with, and as a general proposition, it may be stated that where a person creates a trust fund for the benefit of a particular charity or organization and it is impossible to distinguish any general charitable intent, the fund or property will revert to the donor where it becomes impossible to carry out the purpose of the trust, even in the absence of an express provision for reverter.''

"On the termination of a trust the trustee can not rightfully do any further act under the trust, unless it be that of executing some transfer to the persons equitably entitled thereto. No such transfer, however, seems to be necessary, because on the occurrence of the contingencies which terminate the trust his title must be regarded as at an end and the whole title, both legal and equitable, as vested in the person for whose benefit the property has been held in trust, or as having returned to the creator of the trust or his heirs or other successor in interest. But where a trust on which real estate was conveyed has failed and the trust becomes impossible of performance, it is the duty of the trustee to reconvey to his grantor, and a court of equity, if applied to, will compel a reconveyance.'' 26 R. C. L. 1213, section 56.

To the same effect is a note in 91 A. L. R. 119, citing cases from Michigan, Illinois, Kentucky, California and Pennsylvania.

In *Hopkins* v. *Grimshaw*, 165 U. S. 342, 17 S. Ct. 401, 41 L. Ed. 739, it appears that there was a deed from a private person to three trustees for the use and benefit of a burial ground and for no other purpose. There the cemetery was abandoned, and it was held that the grantor's heirs or assignees were entitled to recover the land by way of a resulting trust.

*Teele* v. *Bishop of Derry*, 168 Mass. 341, 47 N. E. 422, 60 Am. St. Rep. 401, 38 L. R. A. 629, it appears that there was a bequest for the purchase and erection of a Roman

Catholic Church. For reasons unnecessary to detail, the execution of this trust was impossible. The court said: "But, if the charitable purpose is limited to a particular object, or to a particular institution, and there is no general intent, then, if it becomes impossible to carry out the object, or the institution ceases to exist before the gift has taken effect, and possibly in more cases after it has taken effect, the doctrine of *cy pres* does not apply, and, in the absence of any limitation over or other provision, the legacy lapses. There are many cases which, it has been held, fall within this rule."

Other authorities might be cited but these suffice. I shall not catalogue them lest I be open to the charge of belaboring the obvious.

We are not here dealing with a case in which a donor, who had parted with dominion and control over her gift, is seeking to cancel the trust because of maladministration, nor of one who is seeking to break a trust by a recapture of its assets. Many cases are cited which deal with these phases of this subject but they are beyond the mark. In this case the trust is in substance dead by operation of law. It can no longer function for it is impossible to do those things contemplated when it was created. Since it is dead its corpus must go somewhere and to somebody. The *cy pres* doctrine has no application, and so both in law and in good conscience it should go back to its donor, who is in no wise responsible for conditions which have made its administration impossible. She takes it as a resulting trust.

The defendants, appellees here, cite and reply upon *Clark* v. *Oliver*, 91 Va. 421, 22 S. E. 175. That cause sheds no light at all upon our problem. What it does do is to approve and apply a rule of law not here challenged. The court itself tells us what it undertook to decide. "Does the bill state a case entitling the plaintiffs to the relief prayed for?" This, of course, brings us to the bill itself and to the record upon which the opinion rests.

From that bill it appears that certain individuals living in Virginia and elsewhere became interested in negro industrial education and were anxious to have for its benefit an industrial school or institution established in the city of Richmond for the education of young negroes and by voluntary subscriptions a fund of about $8,000 was raised. At that time there was in being in that city a negro church known as the Moore-Street Missionary Baptist Church which had purchased a lot at the price of $5,500. This $5,500, the bill charges, was paid out of the $8,000 contributed for the establishment of an industrial school. The school trustees were dissatisfied with this situation and finally to quiet them a part of the lots so purchased and paid for was conveyed to these school trustees. The deed itself recites the fact that there had been paid on account of this purchase price ''much the larger part thereof by the Moore-Street Industrial Society or School.''

The bill further charges that the land conveyed to the school for the purpose of satisfying its claim was the less valuable part of it. Misappropriation was charged, and in the prayer for relief it is asked that title to all of the property be declared to be in the plaintiffs, who were to continue to hold it in trust until there had been incorporated the Moore-Street Industrial Institution and that all conveyances which constituted a cloud upon its title be cancelled and for general relief.

It will be noted that these complainants asked nothing for themselves. They complain of maladministration. The court rested its decision upon *Ludlam and others* v. *Higbee and others,* 3 Stock. 342, and vouched this statement from that case:

'' * * * the contributors to a fund creating a trust for mere charitable purposes, cannot call the trustees of that fund to an account for misapplication of the funds, or any other breach of the trust. There must be something peculiar in the transaction, beyond the mere fact of contribution, to give a contributor to a charitable fund a

foothold in court to enable him to question the disposition of the fund."

With it I have no quarrel.

The court did, however, say: "There is no such thing as a resulting trust with respect to a charity."

Plainly the court here undertook to cover too much territory and, as I see it, overstated the law.

Throughout the law of charitable trusts, in varying phraseology and under varying conditions, like some leitmotif, runs this constantly recurring note: A donor who has unconditionally established a charitable trust cannot control its administration.

It is also true that where a donor has lost interest in the purposes for which a trust was created and seeks to repossess the fund she must fail. In neither of these cases is there "such thing as a resulting trust with respect to a charity." Beyond this the cases do not go.

Plainly were a fund given to a trustee to be used for the education of a daughter's children and were that daughter to die childless, it is inconceivable that the trustee would be allowed to hold the fund or to devote it to other purposes.

Plaintiff should prevail for other reasons also.

Mrs. Reed, a resident of Missouri and then in that State, undertook to carry out the original provisions in the Litchfield will. She undertook to establish a trust to keep in repair "Litchfield Hall on the campus of Martha Washington College for young ladies located at Abingdon, Virginia." Since her purpose was unambiguous there is nothing to construe. What she had in mind was Litchfield Hall on the *campus* of Martha Washington College for young ladies located in Abingdon, Virginia. The Litchfield clan had no interest in any other memorial, institution or eleemosynary undertaking. She did not know that Martha Washington College had been absorbed by Emory & Henry College, for the unrecorded deed effecting this absorption bears date June 16, 1919, and was not recorded for ten years. The trust itself was created in 1920.

When this gift was accepted, Martha Washington College and its trustees knew from whence it came and why. To ask one to believe that they then thought it could be used for purposes other than that designated is to ask too much. This conclusion is supported, if support be needed, by the fact that Mrs. Cosby, during her lifetime, and Mrs. Penn for many years afterwards continued to pay interest as it accrued, not to Emory & Henry College, but to Martha Washington College, or to its trustees; and they accepted it in that capacity, although they were, of course, aware of the existence of the deed of June 16, 1919.

This trust was established for a clear-cut purpose and for it alone. If it was so accepted by the donee and its executive board that ends this case.

Were we to concede for the sake of argument that it was accepted in the belief that it might lawfully be applied not only to that purpose but to others, then the minds of the parties never met.

If in its acceptance this board cherished a latent intention to give it to Emory & Henry College, to Randolph Macon College, or to some other worth-while institution, it was guilty of fraud, which is not to be presumed for its members were honorable gentlemen.

Campbell, C. J., and Eggleston, J., concur in this dissent.